## Case No. 14,589.

### UNITED STATES v. BEVANS.

Circuit Court, D. Massachusetts. Dec. 16, 1816.

JURISDICTION OF FEDERAL COURTS — OFFENCES ON THE HIGH SEAS — KILLING BY MARINE ON NAVAL VESSEL—ORDERS OF SUPERIOR—POWER OF NAVAL OFFICERS—MURDER AND MANSLAUGHTER—EVIDENCE—PRESUMPTIONS.

[1. An offence committed on a United States naval vessel, while lying in the channel of the harbor of Boston, at a considerable distance from the shore, and outside of low-water mark, is committed upon the "high seas," and consequently is within the jurisdiction of the federal courts.]

[2. The "high seas" are in legal contemplation that portion of the waters of the sea and of the arms of the sea which lies without low-water mark.]

[3. A naval officer in command of a ship has no authority to direct a sentry on duty aboard the vessel to run through the body any man who should abuse the sentry by words alone, however opprobrious; and if any such order should be given it would be unlawful, and could not justify or excuse a homicide committed by the sentry under such circumstances.]

[4. Where a prisoner charged with murder is proved to have killed the deceased, the law presumes that the act was founded in malice until the contrary appears; and the prisoner has the burden of proving that the act was done under circumstances which excuse or justify it, or abate its malignity.]

[5. If upon slight provocation one inflicts with a deadly weapon a punishment outrageous in its nature, and beyond all proportion to the offence, and death results, the law presumes that the act was inspired rather by malignity and a depraved spirit recklessly bent on mischief, than by human frailty.]

[6. Where a sentry on duty on board a United States naval vessel ran through the body with his bayonet one who merely used abusive language to him, held, that if the sentry intended only to strike the deceased with the back of his bayonet or to prick him slightly, and had no intention of killing him, the crime was manslaughter; but that if he meant to kill, or to do some enormous bodily harm, he was guilty of murder.]

STORY, Circuit Justice. Gentlemen of the jury: The prisoner at the bar stands indicted by the grand inquest of the United States for the murder of Peter Lunstrum. To this indictment he has pleaded not guilty, and you are sworn to return your verdict as to his guilt or innocence. The evidence is so simple, and as to the material facts so consistent, and the cause has been argued so fully, candidly, and ably by the learned counsel, that little remains for the court but to sum up, in a brief manner, the general facts, and to state the general principles of law applicable to the facts.

Before, however, I proceed to a statement of the case, there are some preliminary remarks which it is my duty to make in consequence of the suggestion which has fallen from the counsel that you are the judges of the law as well as of the fact. This suggestion requires some explanation and qualification. As the issue in this case is a general issue in which you are to decide the guilt or innocence of the prisoner, it necessarily involves considerations of law as well as facts; and you consequently have the power to decide on both. But you are bound by your oaths to return a verdict according to law and the evidence given you; and the court are bound by their oaths of office to instruct you as to the law. And when the law is stated to you under this solemn, strong and painful obligation, you are as much bound to find your verdicts in conformity to it as you are in any other case which is tried before a jury. It is a great mistake that jurors are at liberty in matters of law to disregard the opinion of the court, upon fanciful distinctions, or opinions of their own; and they may, by such conduct, bring their consciences into peril, and their fellow citizens into jeopardy. Fost. Crown Law, 255.

I will now proceed to a summary of the facts. (Here the judge summed up the facts.) It is in this trial, incumbent upon the United States to establish two things to entitle themselves to your verdict: First, that the crime was committed by the prisoner; and, secondly, that it was committed on the high seas, or in a haven out of the jurisdiction of any particular state. In respect to the last question, it is clear from the evidence that the offence was committed on board the United States ship Inde-

pendence, while lying in the channel of the harbour of Boston, at a considerable distance from the shore, and without low-water mark. Under these circumstances, the court are of opinion that the offence was committed on the "high seas," the high seas being in legal contemplation that portion of the waters of the sea and of the arms of the sea which lies without low-water mark. It is, however, our determination to reserve this question, in case of a conviction, for the decision of the supreme court of the United States, and for this reason it is not necessary particularly to expound the ground of the opinion, which we have expressed.

In considering the other question, it is material to observe that the proof of the crime rests in the first instance, on the United States; but if it is proved that the prisoner killed the deceased all the circumstances of accident, necessity or infirmity which justify or excuse it are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him; for the law presumes the fact to have been founded in malice, until the contrary appears. In the present case there is no question but that the prisoner killed the deceased; he is therefore bound to prove that it was done under circumstances which excuse or justify the act or abate its malignity. It is contended by his counsel, in the first place, that the prisoner stands excused or justified, because he acted under orders, or under a supposition that orders were given to him to kill any person that should insult him by opprobrious words when on his duty or post. There is no direct proof in the case that any such orders were ever given. The course of proceedings on board of ships of war in our service, as testified by the witnesses, in respect to mariners on board, is that the commanding officer of marines gives his orders to the sergeant of the guard, the sergeant to the corporal, and the latter gives the orders to the private when he is put on post. The orders are given in general terms to the sentry, to keep silence within his post, to allow no quarrelling or noise; and where, as in this case, the post comprehends the galley, to suffer no interference with the cooks of the galley. Mr. Legge, the commanding officer of marines on board the Independence, expressly states these to be the general orders given by the superior officers to the sergeants of the guard, and in this statement he is confirmed by Lieut. Freeman. Mr. Legge states that no orders were ever given on board of the Independence by the officer of marines, that authorized any sentry to take the life of any person who should insult him by words, while on duty. There does arise from this testimony a strong presumption that no such orders as those contended for in argument ever were given even by the sergeant or corporal, for it is always pre-

sumed that all officers act within the line of their duty, until the contrary is proved; and it is not lightly to be presumed that sergeants or corporals would violate the orders given to them by their superior officers. Mr. Freeman, however, says that he has known instances in other ships, where corporals have directed sentries when put on post, to run any man through the body for abusive language; and that it is generally understood that the sentry is at liberty to use his arms in case of opposition; and Myers, who is a corporal in the service, declares that he always received orders from the sergeant of the guard, when he put a sentry on post, to run any man through the body who made a noise or disturbance while he was on post. Rutter, another corporal of marines, says that he never understood that such authority was given, unless where there was some weapon used by the offending party. It is for the jury to decide upon this evidence whether they can reasonably infer, that on board of the Independence the prisoner had received orders to the effect contended for; and if they can infer it against the express testimony of Mr. Legge, and the natural presumption that his orders were duly communicated by the subordinate officers, then it becomes our duty to instruct you as to the legality of such orders, and the effect which they ought to have upon your verdict.

It is argued by the counsel for the prisoner, that it is indispensable for the discipline of the naval service that such orders should be given, and should be instantly executed, and that a power of unlimited and arbitrary discretion resides in the officers of the ship to compel obedience of all commands, at all times, and under all circumstances, even by taking away life. I confess that it never occurred to me until this trial that any person in this country ever dreamed of the existence of such an arbitrary power. This is emphatically a government of laws, and not of men. The military and naval forces are created by the laws, and regulated by a code which ascertains their powers and enforces their duties. The officers and privates of the navy, and the corps of marines, when acting in the naval service, are bound by the rules and regulations enacted for the service by the acts of congress; and whoever overleaps the power given to him is responsible for his conduct, either to the civil or military tribunals, according as the acts fall within the cognizance of the one or the other. The arbitrary power of life and death is not committed even to the president of the United States, who is commander in chief of the army and navy, much less is it confided to a commander of a ship, and, least of all, to a mere private sentry upon duty. Let me read to you a few of the articles in the act of congress of the 23d of April, 1800, c. 33 [2 Stat. 45.] (Here the judge read the third, thirteenth, fourteenth, fifteenth, and thirti-

eth articles of the act.) You cannot but observe that these articles, which are selected from a larger number, contain rules for the punishment of a great many crimes, some of which are of a very slight and trivial character; and that in every instance in which the life of the offender can be taken away it is expressly provided for in the statute. The fifteenth article is particularly pointed to the present case. It declares that "no person in the navy, shall quarrel with any other person in the navy, nor use provoking or reproachful words, gestures and menaces, on pain of such punishment as a court martial shall adjudge." And by the thirteenth article no commanding officer shall, of his own authority, inflict a punishment on any private, beyond twelve lashes with a cat of nine tails; and if the offence requires severer punishment, it can be adjudged only by a court martial. Can it be possible that when these articles have so sedulously guarded against an arbitrary discretion in punishment in a commanding officer, that an inferior officer, or mere private, may, of his own accord, inflict the punishment of death? Or that, when the act has declared that quarrelling, or using reproachful words, shall be punished as a court martial shall adjudge (which cannot, in this instance, be by death), that any officer is yet at liberty for the same offence to inflict the punishment of death? It cannot be. The law is perfectly clear upon this subject. Such an order would be illegal and void, and not binding upon any person; and the party who should give the order, equally with the party who should execute it, would be involved in the guilt of murder. No person can respect the officers of the navy more than myself, or more honour their gallant and glorious achievements. They are justly the pride of our country, and its safeguard and protection. But they are not above the law; and if they possessed the tyrannical power now contended for (which they do not pretend to) they would soon become the objects of odium among the people, and the safety and usefulness of their patriotism would be materially impaired. Civil tribunals are not practically acquainted with all the necessities of the naval service; and they cannot but be sensible of the importance of rigid discipline and prompt obedience, upon which the safety and efficiency of the service must materially depend. We should not, therefore, scrutinize with any jealous eyes the rules and orders established to enforce that discipline and obedience. We should cheerfully aid in their execution. But this can only be when those rules and orders are consistent with law, and not when they are against the express provisions of law, and against natural justice. It is not to be imagined from this that officers in the navy are not in any case authorized to take away life in enforcing the duties of their stations. They stand in this particular upon the same grounds as civil officers. They have a right, in case of necessity, to enforce obedience to orders and a performance of duties by the punishment of death. But the necessity must be a clear and urgent one. The orders must be of a nature that require instant obedience, and the force employed must be such as the occasion indispensably requires. If, for instance, as in the case put at the bar, where the ship is on fire, and the fire is advancing to the magazine, the party refuses to assist, or to obey the lawful orders of his officer, the latter may enforce obedience at the point of the bayonet, if it cannot be otherwise compelled. In the present case, it is the decided opinion of the court that if orders were given to the sentry to run a man through the body who should abuse the sentry by reproachful words only, those orders were unlawful, and cannot justify or excuse the homicide.

The next consideration is whether the offence upon the facts in this case was murder or manslaughter. Murder is the unlawful killing of another with malice aforethought. Manslaughter is the unlawful killing of another without malice aforethought. In this view it is important to ascertain what the law intends by malice. It would be a great mistake to suppose that by malice aforethought the law intended only that cool, deliberate purpose of killing another which is accompanied by dark schemes and secret contrivances, such as producing death by the administration of poison, or by midnight assassination. Nor does malice necessarily imply a principle of malevolence to particular individuals. It embraces all those cases where the fact has been attended with such circumstances as are the ordinary symptoms of a wicked, depraved, and malignant spirit; or, as Sir Michael Foster has expressed it, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief. Fost. Crown Law, 257. If therefore the provocation be slight, and the punishment be outrageous in its nature or continuance, and beyond all proportion to the offence, and it be inflicted with a deadly weapon, under the like circumstances, and the party dies, the offence is considered as rather the effort of a brutal and diabolical malignity than of human frailty. It is one of the true symptoms of what the law denominates malice, and therefore the crime will amount to murder, notwithstanding such provocation. 1 East, P. C. 234; Fost. Crown Law, 291. In the present case the provocation was merely by words; words indeed of a gross and unjustifiable nature, and which deserve the severest reprehension. There is not the slightest proof that any blow was struck or intended to be struck by the deceased. Indeed, his situation at the time of the fatal wound, he at that time leaning on his arms over the harness cask, seems to repel any such presumption. The wound, too, was inflicted by a dangerous and mortal weapon. It is my duty to declare to you what the law

is, under these circumstances, and I will do it in the words of one of the ablest and most merciful judges that ever adorned the bench. Sir Michael Foster states (Fost. Crown Law, 290), and his opinion is the undoubted law, that "words of reproach, how grievous soever, are not a provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions or gestures expressive of contempt or reproach, without an assault upon the person. This rule will, I conceive, govern every case where the party killing upon such provocation maketh use of a deadly weapon, or otherwise manifesteth an intention to kill or to do some great bodily harm. And it ought to be remembered that in all other cases of homicide upon slight provocation, if it may be reasonably collected from the weapon made use of, or from any other circumstance, that the party intended to kill, or to do some great bodily harm, such homicide will be murder." In this connection it will be proper for you to consider whether it was the intention of the prisoner to kill or inflict a great bodily harm with his bayonet, or only to inflict a slight chastisement, and, aside from his purpose, the instrument inflicted a mortal wound. This is one of the pivots on which this case must turn. For if the prisoner intended only to strike with the back of his bayonet, or only slightly to prick the deceased in a part not liable to be attended with dangerous consequences, and was not guilty of such intention, then the crime may be mitigated into manslaughter; but if he meant to kill or to do some enormous bodily harm, it amounts to murder. You will consider his conduct before, at, and after the fatal wound was given. You will judge of the violence of his threats that if the deceased repeated the offensive words again he would run him through. You will consider the situation of the parties at the time of the wound, the one armed and leaning on a cask, the other approaching him with a moderate walk, not raising his arm to strike until the moment the wound was given; the oblique manner in which the stroke was given, the force with which it was given, the bayonet, after glancing on the ribs, having penetrated to the depth of five inches and the circumstances that the prisoner, after the death, exhibited no contrition, and expressed no sorrow for what he had done, or that he had done more than he intended. Upon weighing all these circumstances and all others which may occur to you, if you are satisfied that the prisoner intended to kill, or to do a great bodily harm, then the offence was, if you believe the facts, murder; otherwise it may be only manslaughter.

In weighing the evidence and circumstances, if you have reasonable doubts, those should operate in favor of the prisoner. But the doubts should be reasonable, and you should not suffer yourselves to be led astray by visionary doubts, or by a false tenderness for human life, which may pervert your judg-

ments. If you give a verdict conformable to the dictates of your consciences, you cannot have serious reason here or hereafter to regret it. If, on the other hand, you suffer yourselves from any motives whatsoever to give a verdict which your consciences do not approve, you cannot be justified hereafter.

The trial continued till about two o'clock, when the jury retired, and a little before five o'clock, brought in a verdict of "Guilty."

[NOTE. Upon certificate of division of opinion the supreme court decided that in the case above the circuit court had not jurisdiction to try the offense. Mr. Chief Justice Marshall delivered the opinion. 3 Wheat. (16 U. S.) 336.]