**Tommy E. SWATE, Plaintiff,**

v.

**Bruce S. TAYLOR, et al., Defendants.**

**No. CIV.A. H-94-727.**

United States District Court, Southern District of Texas, Houston Division.

Aug. 28, 1998.

---

Patrick J. Gilpin, Houston, TX, for Plaintiff.

Eleanor A. Robinson–Gaither, Assistant United States Attorney, Houston, TX, for Defendants.

Opinion on Liability

HUGHES, District Judge.

1. *Introduction.*

In the hands of the Drug Enforcement Administration, the tradition of public service in law enforcement has gone from "One riot—one Ranger" to "one search warrant—one regional press officer, six assistants, and a television crew."

The owner of two private methadone clinics sued an agent for converting a limited, court-authorized intrusion to seize records into a spectacle of invasion by bringing a commercial television crew with her. Including wholly extraneous outsiders in a search unreasonably exceeds the legal scope of the warrant, violating the owner's rights under the Constitution.

## 2. Raid.

Tommy E. Swate, a medical doctor, treated drug addicts at his two Houston methadone clinics. In the spring of 1992, the Drug Enforcement Agency (DEA) suspended Swate's registration that allowed him to dispense drugs.

Teresa Hayth Pack (Pack), a DEA agent, obtained show cause orders to search the clinics on four separate occasions. She went to each clinic once to seize records of drug distribution. Pack went to each clinic again on separate occasions to seize specific documents and the methadone. Pack's search for and seizure of drug distribution records were authorized by warrants directed to "Teresa L. Hayth and any other authorized investigator or agent of the Drug Enforcement Administration of the United States Department of Justice." (She has since married and uses the surname Pack.) Her search for and seizure of methadone were authorized by warrants direct to DEA "special agents and diversion investigators."

Only DEA officers were present when Pack searched for and seized the drug distribution records at the clinics.

When Pack searched the Park Place clinic to seize its methadone she was accompanied by DEA officers John Moseman, Dawn Nunley, Tom Lentini, Wendell Campbell, James Lytle, and City of Houston police officers. She also brought a crew from Channel 26 and allowed them to enter the clinic. Clinic employees tried to prevent the crew from filming the search, but Pack told them that the news people could stay.

The next month, Pack arrived at the Pinedale clinic to seize its methadone with DEA officers John Moseman, Rodney Waller, Tom Lentini, Roger Guevara, Robert Piaz, and City of Houston police officers. She brought a crew from the television show *60 Minutes*. Pack demanded to be admitted to the clinic and then let the television crew enter the clinic and film the search.

In both of the methadone seizures, Tom Lentini, the DEA's public relations officer, had notified the news media and given them permission to join the search teams. The DEA officers and the crew met before the raid and drove to the clinics together.

Swate sued Pack, who was the agent-in-charge and supervised the searches, and two state officers. The state officers acted under the authority of a state warrant and have been dismissed.

## 3. Warrants.

Pack's first defense is that the show cause order is not a warrant. Pack searched the clinics and seized documents and drugs under the authority of the order. If the order is not a search warrant, Pack had no business being there.

■ Search warrants are instances of the class of instruments known as writs. The original meaning of "writ" is synonymous with "a writing" in modern usage. Writs are written notice of some action by a court; they are written and delivered by the clerk to the responsible officer. They include summons, arrest, subpoena, habeas corpus, and injunction. Writs can flow between courts as in the cases of certiorari, error, and mandamus.

■ A warrant is a description of authority that has been granted—a delegation inferior to a commission. In addition to the uses of warrants in legal proceedings, warrants are commonly used to authorize withdrawal of public funds and the appointment of lower ranks of officers. The written description advises the officer of her responsibilities and the public of her lawful power. Like other grants in law, a warrant allows the officer only the specific authority described in the instrument itself.[1]

## 4. Warrant Requirement.

The events that were fresh in the minds of the Founders help us understand the Consti-

---

1. *See* Bryan A. Garner, A Dictionary of Modern Legal Usage 2d 924 (1995); *see also Marbury v.*

tution's prohibition on unreasonable searches and seizures. Two events were most prominent: the resistance of the colonial judiciary to the issuance of writs of assistance and the battle for liberty waged in England against unreasonable searches by government officials.

Writs of assistance empowered the monarchy's revenue officers to search any place for untaxed goods at the officer's discretion and were widely used in New England until the death of George II in 1760. Writs of assistance cloaked an officer of His Majesty's Customs with the authority

> to enter and go into any House, Warehouse, Shop, Cellar, or other Place, and in case of Resistance to break open Doors, Chests, Trunks and other Package, there to seize, and from thence to bring any kinds of Goods or Merchandize whatsoever, prohibited or uncustomed; and to put and secure the same in His Majesty's Storehouse.[2]

The writs of assistance had to be reissued by the courts after the death of a monarch. A mid-eighteenth century barrister argued that general warrants placed "the liberty of every man in the hands of every petty officer" and violated the principle that "a man's house is his castle." [3]

While the battle against writs of assistance was waged in the colonies, a similar battle waged in England: "Armed with sweeping warrants issued by executive officials, various government henchmen broke into Englishmen's houses, searched their papers, arrested their persons, and rummaged through their effects to find [seditious] materials." [4] These searches were widely condemned by the general public.[5]

▮ In response to these abuses of power by the government, the Founders abolished general warrants, restricted the government's ability to search without warrants, and required individual authorization of specific warrants. Today, search warrants are specific instruments that restrict government, dictate who may conduct a search, what may be searched, and when it may be searched. Both the procurement of the search warrant and its execution must be done under the law; otherwise the search is an unconstitutional abuse of governmental power.

The basis of the Founders' fears for liberty has not diminished in the last two hundred years. The potential for liberty-destroying intrusions has increased with the growth of government. Today the ratio of government officers to population is forty times greater than at the founding.[6]

## 5. *Unreasonable.*

▮ After outlawing general warrants, the Constitution guarantees the right to be

*Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803) (John Marshall's failure as secretary of state to deliver commissions to justices of the peace appointed in the last hours of John Adams's administration prevented their having a right to the offices).

2. *Writs of Assistance*, in THE FOUNDER'S CONSTITUTION 222, 223 (Philip B. Kurland & Ralph Lerner eds., 1987).

3. *Boyd v. United States*, 116 U.S. 616, 624–26, 6 S.Ct. 524, 29 L.Ed. 746 (1885) (quoting barrister).

4. Akhil Reed Amar, *The Fourth Amendment, Boston, and the Writs of Assistance*, 30 Suffolk U.L.Rev. 53, 65 (1996). Amar raises two English cases as illustrating the history of a tort remedy for violations of the Fourth Amendment. *See Wilkes v. Wood*, 19 Howell's State Trials, 1153 (C.P.1763), 98 Eng. Rep. 489; *Entick v. Carrington*, 19 Howell's State Trials, 1029 (C.P.1765), 95

Eng. Rep. 807. In each of these cases the citizen who had been the subject of the illegal search sued the government henchmen and recovered "massive punitive damages."

5. *See Amar supra* note 4 at 65–67.

6. This is an approximation. The number of federal civil employees in 1795 is taken as a surrogate of the colonial officers with "national" functions during the later British years. In 1795, there were 1,230 federal civil employees; this is the earliest year available. *See* THOMAS L. PURVIS, REVOLUTIONARY AMERICA 1763 TO 1800 230 (1994). The 1790 population was about four million. *See* THE WORLD ALMANAC AND BOOK OF FACTS 1996 384–85 (Robert Famighetti ed., 1996). In 1990, there were 3.1 million civil employees in a population of 248 million. *See id.; see also* Bureau of the Census, Economics· and Statistics Administration, U.S. Dep't of Commerce, *Statistical Abstract of the United States 1993* 317 (113th ed.1994).

free from unreasonable searches. A search is unreasonable when it exceeds the scope of the warrant. Including extra people may exceed the scope of the warrant. Of course, others may be included in the execution of the warrant when it expressly names them or their capacity.[7] Unnamed persons may be used when they are reasonably related to accomplishing the search, like a locksmith or computer expert.[8]

### 6. *Elements of a Violation.*

■ To have a claim under the statutes enforcing the Constitution, Swate must demonstrate these three things:

- Pack acted in a governmental capacity;
- Her actions were not merely negligent; and
- Her actions deprived Swate of a liberty protected by the Constitution.

Pack was on Swate's land in her official capacity as an officer of the DEA. Pack deliberately brought the news crews with her during the execution of the search. Once she allowed the news crews to set foot on Swate's property, Pack exceeded the scope of her warrant—unreasonably searching Swate in violation of his federal rights.

### 7. *Immunity.*

Only agents of the government can be held responsible for violating the Constitution's limits on governmental authority; that is axiomatic. If the officer is not an agent of the government, her liability does not arise under the Constitution. Being a government agent includes those people who are acting under the color of law, including confidential informants paid or directed by the government.

Courts have devised a zone of discretion to protect officers from liability in instances of policy choices and in instances of new limits. The use of a search warrant involves no choice among lawful policies; it is a routine, physical operation.

Officials *may* qualify for this conditional immunity from liability by showing that the circumstances involved a right of the citizen that was not clearly established and that their actions were objectively reasonable in light of standards that were clearly established. If the officer trespasses on a clearly knowable right, the act's objective reasonableness under the circumstances generally cannot immunize her, for simple reasonableness—objective or otherwise—cannot legitimate an act the Constitution clearly forbids. It might be objectively reasonable to elect a president under the age of thirty-five, but the Constitution clearly says that is not an option.[9]

■ Pack qualifies for immunity if: (a) her conduct did not deprive Swate of a clearly established right and (b) her conduct was objectively reasonable.[10] Deciding whether conduct was objectively reasonable depends on the context at the time as well as the clear law.

### 8. *Clearly Established.*

Courts have decided that government agents should not be held liable for violating citizens' rights unless the rights are clearly established. This judicial solicitude is not shown citizens when they are confronted with liability to the government under vague, evolving standards.

This protection was thoroughly established in 1992. The text of the Constitution has since 1791 powerfully and clearly announced the restrictions on searches. That is 201 years of notice. Seventy-eight years ago federal officers were notified that if they did not abide by the Text the government could not use the discoveries from their unlawful

**7.** *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n. 7, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (stating that the Fourth Amendment strictly confines an officer executing a search warrant to the limits set by the warrant).

**8.** *See* 18 U.S.C. § 3105 (1994) (allowing unauthorized persons to attend execution of warrant when providing aid to the officer, is there at the officer's request and in the officer's presence).

**9.** *See* U.S. Const. art. II, § 1, cl. 5.

**10.** *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

searches.[11] The suppression and exclusion of evidence because of government illegality has been a staple of political and legal discourse in America for at least three-quarters of a century.

In 1917, Congress passed a law reaffirming the proscription against third persons from accompanying federal officers when not assisting the officer in execution of the search warrant.[12]

 Federal law about who may accompany an officer on a search is well-established and clear; it does not include commercial news crews. If the DEA decided it should as a function of the public's business film its search to protect itself against claims of vandalism or brutality, it could have done that. What it did, however, was turn the clinics into resources for television shows.

### 9. Circumstances.

Nothing in the circumstances of the search plausibly required a reasonable, responsible officer to bring into the clinics private third-parties who were exploiting for their purposes the warrant she held.

Pack claims that she reasonably believed that the media's presence and filming were legal because her supervisors did not object to the presence of the media. This is an argument of subjective reasonableness. Her position that the others seemed to think it was acceptable denies the requirement that she use her judgment in acting in the public's name. It is the exercise of judgment that earns immunity—not abdication to the regional press officer.

The officer has not suggested that she needed a film crew to execute the warrant effectively and safely.

### 10. Following Orders.

 Pack says she should not be held responsible for the presence of the outsiders because they were alerted and brought by her superiors. The officer conducting the search is responsible for her acts. She acknowledges that she was the agent in charge of the operation of seizing the clinic's records; she cannot deny that the warrant was addressed to her.

 Assuming that she was directly ordered to take the crew with her into the clinic and to tell the nursing staff that the crew could not be excluded, she has an independent, individual responsibility to follow the law. The Constitution requires each subordinate officer to make her oath directly to the Constitution and not to the president, government, or other superior.[13] Her responsibility is in the Text.

An illegal order is an insufficient warrant to act.[14] From Andersonville through Nuernberg to My Lai, excesses of superiors do not justify excesses of subordinates. As the agent-in-charge, Pack was responsible for the execution of the warrants. She had the badge, the warrant, and the authority to investigate.

Her subjective belief of legality was predicated on her supervisors' silence, but she did not question what they were doing with her warrant. This is not the case of a soldier in the uncertain, fluid, and dangerous context of a foreign battlefield who is faced with a close call; this is the case of two searches one month apart, of air-conditioned offices, of public relations flunkies.

### 11. Conclusion.

Swate's clearly-established constitutional right to be free from governmental intrusion was violated when a federal agent acting under the authority of a search warrant gave

---

11. *See Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

12. *See* 18 U.S.C. § 3105 (1994) (stating that a search warrant may not be served by a person other than an officer named in it or by an officer authorized by law to serve it, unless the person is providing aid to the officer at the officer's request and in the officer's presence).

13. *See* U.S. Const. art. VI, § 3.

14. *See United States v. Bevans*, 24 F. Cas. 1138 (C.C.D.Mass.1816) (No 14,589) (Story, J.) (convicting a Marine guarding the frigate *Independence* who bayoneted a disrespectful civilian in Boston following standing orders to maintain the peace aboard ship during the War of 1812); *Axtell's Case*, 84 Eng. Rep. 1060 (1660).

news crews access to his clinics. An illegal expansion of a search is like an illegal arrest, the citizen cannot stop it; he must look to redress after the dust has settled. Because Pack entered with armed officers and a warrant, Swate could not stop her from taking control of his clinics or from allowing others to enter.

The DEA may be free to publicize some of its actions, but its agents cannot convert the property and lives of citizens into consumable supplies for its public relations campaign. The news media should publicize the government's actions, but they may not use governmental authority to acquire locations from unwilling citizens.

Pack will be denied a judgment, and Swate will be granted a partial judgment on liability as a matter of law.