# BOYD *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

· Argued December 11, 14, 1885.—Decided February 1, 1886.

The 5th section of the act of June 22, 1874, entitled "An Act to amend the customs revenue laws," &c., which section authorizes a court of the United States, in revenue cases, on motion of the government attorney, to require the defendant or claimant to produce in court his private books, invoices and papers, or else the allegations of the attorney to be taken as confessed : *Held,* To be unconstitutional and void as applied to suits for penalties, or to establish a forfeiture of the party's goods, as being repugnant to the Fourth and Fifth Amendments of the Constitution.

Where proceedings were *in rem* to establish a forfeiture of certain goods alleged to have been fraudulently imported without paying the duties thereon, pursuant to the 12th section of said act : *Held,* That an order of the court made under said 5th section, requiring the claimants of the goods to produce a certain invoice in court for the·inspection of the government attorney, and to be offered in evidence by him, was an unconstitutional exercise of authority, and that the inspection of the invoice by the attorney, and its admission in evidence, were erroneous and unconstitutional proceedings.

It does not require actual entry upon premises and search for and seizure of papers to constitute an unreasonable search and seizure within the meaning of the Fourth Amendment ; a compulsory production of a party's private books and papers to be used against himself or his property in a criminal or penal proceeding, or for a forfeiture, is within the spirit·and meaning of the Amendment.

It is equivalent to a compulsory production of papers, to make the non-production of them a confession of the allegations which it is pretended they will prove.

A proceeding to forfeit a person's goods for an offence against the laws, though civil in form, and whether *in rem* or *in personam,* is a " criminal case" within the meaning of that part of the Fifth Amendment which declares that no person " shall be compelled, in any criminal case, to be a witness · against himself."

The seizure or compulsory production of a man's private papers to be used in evidence against him is equivalent to compelling him to be a witness against himself, and,· in a prosecution for a crime, penalty or forfeiture, is equally within the prohibition of the Fifth Amendment.

Both amendments relate to the personal security of the citizen. They nearly run into and mutually throw light upon each other. When the thing forbidden in the Fifth Amendment, namely, compelling a man to be a witness against himself, is the object of a search and seizure of his private papers, it is an " unreasonable search and seizure " within the Fourth Amendment.

Search and seizure of a man's private papers to be used in evidence for the purpose of convicting him of a crime, recovering a penalty, or of forfeiting his property, is totally different from the search and seizure of stolen goods, dutiable articles on which the duties have not been paid, and the like, which rightfully belong to the custody of the law.

Constitutional provisions for the security of person and property should be liberally construed.

This was an information against thirty-five cases of polished plate glass. The facts which make the case are stated in the opinion of the court. Judgment in favor of the United States. The claimants sued out this writ of error.

*Mr. Edwin B. Smith* for plaintiff in error. *Mr. Stephen G. Clarke* was with him on the brief.

*Mr. Solicitor-General* for defendant in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This was an information filed by the District Attorney of the United States in the District Court for the Southern District of New York, in July, 1884, in a cause of seizure and forfeiture of property, against thirty-five cases of plate glass, seized by the collector as forfeited to the United States, under § 12 of the "Act to amend the customs revenue laws, and to repeal moieties," passed June 22, 1874. 18 Stat. 186.

It is declared by that section that any owner, importer, consignee, &c., who shall, with intent to defraud the revenue, make, or attempt to make, any entry of imported merchandise, by means of any fraudulent or false invoice, affidavit, letter or paper, or by means of any false statement, written or verbal, or who shall be guilty of any wilful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, shall for each offence be fined in any sum not exceeding $5000 nor less than $50, or be imprisoned for any time not exceeding two years, or both; and, in addition to such fine, such merchandise shall be forfeited.

The charge was that the goods in question were imported

into the United States to the port of New York, subject to the payment of duties; and that the owners or agents of said merchandise, or other person unknown, committed the alleged fraud, which was described in the words of the statute. The plaintiffs in error entered a claim for the goods, and pleaded that they did not become forfeited in manner and form as alleged. On the trial of the cause it became important to show the quantity and value of the glass contained in twenty-nine cases previously imported. To do this the district attorney offered in evidence an order made by the District Judge under § 5 of the same act of June 22, 1874, directing notice under seal of the court to be given to the claimants, requiring them to produce the invoice of the twenty-nine cases. The claimants, in obedience to the notice, but objecting to its validity and to the constitutionality of the law, produced the invoice; and when it was offered in evidence by the district attorney they objected to its reception on the ground that, in a suit for forfeiture, no evidence can be compelled from the claimants themselves, and also that the statute, so far as it compels production of evidence to be used against the claimants is unconstitutional and void.

The evidence being received, and the trial closed, the jury found a verdict for the United States, condemning the thirty-five cases of glass which were seized, and judgment of forfeiture was given. This judgment was affirmed by the Circuit Court, and the decision of that court is now here for review.

As the question raised upon the order for the production by the claimants of the invoice of the twenty-nine cases of glass, and the proceedings had thereon, is not only an important one in the determination of the present case, but is a very grave question of constitutional law, involving the personal security, and privileges and immunities of the citizen, we will set forth the order at large. After the title of the court and term, it reads as follows, to wit:

" The United States of America
*against*
E. A. B., 1–35, Thirty-five Cases of Plate Glass. }

" Whereas the attorney of the United States for the South-

ern District of New York has filed in this court a written motion in the above-entitled action, showing that said action is a suit or proceeding other than criminal, arising under the customs revenue laws of the United States, and not for penalties, now pending undetermined in this court, and that in his belief a certain invoice or paper belonging to and under the control of the claimants herein will tend to prove certain allegations set forth in said written motion, hereto annexed, made by him on behalf of the United States in said action, to wit, the invoice from the Union Plate Glass Company or its agents, covering the twenty-nine cases of plate glass marked G. H. B., imported from Liverpool, England, into the port of New York in the vessel Baltic, and entered by E. A. Boyd & Sons at the office of the collector of customs of the port and collection district aforesaid on April 7th, 1884, on entry No. 47,108 :

" Now, therefore, by virtue of the power in the said court vested by section 5 of the act of June 22, 1874, entitled ' An act to amend the customs-revenue laws and to repeal moieties,' it is ordered that a notice under the seal of this court, and signed by the clerk thereof, be issued to the claimants, requiring them to produce the invoice or paper aforesaid before this court in the court-rooms thereof in the United States post-office and court-house building in the city of New York on October 16th, 1884, at eleven o'clock a. m., and thereafter at such other times as the court shall appoint, and that said United States attorney and his assistants and such persons as he shall designate shall be allowed before the court, and under its direction and in the presence of the attorneys for the claimants, if they shall attend, to make examination of said invoice or paper and to take copies thereof ; but the claimants or their agents or attorneys shall have, subject to the order of the court, the custody of such invoice or paper, except pending such examination."

The 5th section of the act of June 22, 1874, under which this order was made, is in the following words, to wit :

" In all suits and proceedings other than criminal arising under any of the revenue laws of the United States, the attorney representing the government, whenever in his belief any

business book, invoice, or paper belonging to, or under the control of, the defendant or claimant, will tend to prove any allegation made by the United States, may make a written motion, particularly describing such book, invoice, or paper, and setting forth the allegation which he expects to prove; and thereupon the court in which suit or proceeding is pending may, at its discretion, issue a notice to the defendant or claimant to produce such book, invoice, or paper in court, at a day and hour to be specified in said notice, which, together with a copy of said motion, shall be served formally on the defendant or claimant by the United States marshal by delivering to him a certified copy thereof, or otherwise serving the same as original notices of suit in the same court are served; and if the defendant or claimant shall fail or refuse to produce such book, invoice, or paper in obedience to such notice, the allegations stated in the said motion shall be taken as confessed, unless his failure or refusal to produce the same shall be explained to the satisfaction of the court. And if produced the said attorney shall be permitted, under the direction of the court, to make examination (at which examination the defendant, or claimant, or his agent, may be present) of such entries in said book, invoice, or paper as relate to or tend to prove the allegation aforesaid, and may offer the same in evidence on behalf of the United States. But the owner of said books and papers, his agent or attorney, shall have, subject to the order of the court, the custody of them, except pending their examination in court as aforesaid." 18 Stat. 187.

This section was passed in lieu of the 2d section of the act of March 2, 1867, entitled "An act to regulate the Disposition of the Proceeds of Fines, Penalties, and Forfeitures incurred under the Laws relating to the Customs and for other Purposes," 14 Stat. 547, which section of said last-mentioned statute authorized the district judge, on complaint and affidavit that any fraud on the revenue had been committed by any person interested or engaged in the importation of merchandise, to issue his warrant to the marshal to enter any premises where any invoices, books, or papers were deposited relating to such merchandise, and take possession of such books and papers and

produce them before said judge, to be subject to his order, and allowed to be examined by the collector, and to be retained as long as the judge should deem necessary. This law being in force at the time of the revision, was incorporated into §§ 3091, 3092, 3093 of the Revised Statutes.

The section last recited was passed in lieu of the 7th section of the act of March 3, 1863, entitled "An act to prevent and punish Frauds upon the Revenue, to provide for the more certain and speedy Collection of Claims in Favor of the United States, and for other Purposes." 12 Stat. 737. The 7th section of this act was in substance the same as the 2d section of the act of 1867, except that the warrant was to be directed to the collector instead of the marshal. It was the first legislation of the kind that ever appeared on the statute book of the United States, and, as seen from its date, was adopted at a period of great national excitement, when the powers of the government were subjected to a severe strain to protect the national existence.

The clauses of the Constitution, to which it is contended that these laws are repugnant, are the Fourth and Fifth Amendments. The Fourth declares, " The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fifth Article, amongst other things, declares that no person " shall be compelled in any criminal case to be a witness against himself."

But, in regard to the Fourth Amendment, it is contended that, whatever might have been alleged against the constitutionality of the acts of 1863 and 1867, that of 1874, under which the order in the present case was made, is free from constitutional objection, because it does not authorize the search and seizure of books and papers, but only requires the defendant or claimant to produce them. That is so ; but it declares that if he does not produce them, the allegations which it is affirmed they will prove shall be taken as confessed. This is tan-

tamount to compelling their production; for the prosecuting attorney will always be sure to state the evidence expected to be derived from them as strongly as the case will admit of. It is true that certain aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching amongst his papers, are wanting, and to this extent the proceeding under the act of 1874 is a mitigation of that which was authorized by the former acts; but it accomplishes the substantial object of those acts in forcing from a party evidence against himself. It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the Fourth Amendment to the Constitution, in all cases in which a search and seizure would be; because it is a material ingredient, and effects the sole object and purpose of search and seizure.

The principal question, however, remains to be considered. Is a search and seizure, or, what is equivalent thereto, a compulsory production of a man's private papers, to be used in evidence against him in a proceeding to forfeit his property for alleged fraud against the revenue laws—is such a proceeding for such a purpose an "*unreasonable* search and seizure" within the meaning of the Fourth Amendment of the Constitution? or, is it a legitimate proceeding? It is contended by the counsel for the government, that it is a legitimate proceeding, sanctioned by long usage, and the authority of judicial decision. No doubt long usage, acquiesced in by the courts, goes a long way to prove that there is some plausible ground or reason for it in the law, or in the historical facts which have imposed a particular construction of the law favorable to such usage. It is a maxim that, *consuetudo est optimus interpres legum;* and another maxim that, *contemporanea expositio est optima et fortissima in lege.* But we do not find any long usage, or any contemporary construction of the Constitution, which would justify any of the acts of Congress now under consideration. As before stated, the act of 1863 was the first act in this country, and, we might say, either in this country or in England, so far as we have been able to ascertain, which authorized the

search and seizure of a man's private papers, or the compulsory production of them, for the purpose of using them in evidence against him in a criminal case, or in a proceeding to enforce the forfeiture of his property. Even the act under which the obnoxious writs of assistance were issued * did not go as far as this, but only authorized the examination of ships and vessels, and persons found therein, for the purpose of finding goods prohibited to be imported or exported, or on which the duties were not paid, and to enter into and search any suspected vaults, cellars, or warehouses for such goods. The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books, and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto cœlo*. In the one case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; † and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment. So, also, the supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law

---

* *Note by the Court.*—13.& 14 Car. 2, c. 11, § 5.

† *Note by the Court.*—12 Car. 2, c. 19; 13 & 14 Car. 2, c. 11; 6 & 7 W. & M., c. 1; 6 Geo. 1, c. 21; 26 Geo. 3, c. 59; 29 Geo. 3, c. 68, § 153; &c.; and see the article "Excise, &c.," in Burn's Justice, and Williams's Justice, *passim*, and Evans's Statutes, vol. 2, p. 221, sub-pages 176, 190, 225, 361, 431, 447.

to · be kept for their inspection, are necessarily excepted out of the category of unreasonable searches and seizures. So, also, the laws which provide for the search and seizure of articles and things which it is unlawful for a person to have in his possession for the purpose of issue or disposition, such as counterfeit coin, lottery tickets, implements of gambling, &c., are not within this category. *Commonwealth* v. *Dana,* 2 Met. (Mass.) 329. Many other things of this character might be enumerated. The entry upon premises, made by a sheriff or other officer of the law, for the purpose of seizing goods and chattels by virtue of a judicial writ, such as an attachment, a sequestration, or an execution, is not within the prohibition of the Fourth or Fifth Amendment, or any other clause of the Constitution; nor is the examination of a defendant under oath after an ineffectual execution, for the purpose of discovering secreted property or credits, to be applied to the payment of a judgment against him, obnoxious to those amendments.

But, when examined with care, it is manifest that there is a total unlikeness of these official acts and proceedings to that which is now under consideration. In the case of stolen goods, the owner from whom they were stolen is entitled to their possession; and in the case of excisable or dutiable articles, the government has an interest in them for the payment of the duties thereon, and until such duties are paid has a right to keep them under observation, or to pursue and drag them from concealment; and in the case of goods seized on attachment or execution, the creditor is entitled to their seizure in satisfaction of his debt; and the examination of a defendant under oath to obtain a discovery of concealed property or credits is a proceeding merely civil to effect the ends of justice, and is no more than what the court of chancery would direct on a bill for discovery. Whereas, by the proceeding now under consideration, the court attempts to extort from the party his private books and papers to make him liable for a penalty or to forfeit his property.

In order to ascertain the nature of the proceedings intended by the Fourth Amendment to the Constitution under the terms " unreasonable searches and seizures," it is only necessary to

Opinion of the Court.

recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced " the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book;" since they placed "the liberty of every man in the hands of every petty officer." * This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. " Then and there," said John Adams, " then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.".

These things, and the events which took place in England immediately following the argument about writs of assistance in Boston, were fresh in the memories of those who achieved our independence and established our form of government. In the period from 1762, when the North Briton was started by John Wilkes, to April, 1766, when the House of Commons passed resolutions condemnatory of general warrants, whether for the seizure of persons or papers, occurred the bitter controversy between the English government and Wilkes, in which the latter appeared as the champion of popular rights, and was, indeed, the pioneer in the contest which resulted in the abolition of some grievous abuses which had gradually crept into the administration of public affairs. Prominent and principal among these was the practice of issuing general

---

* *Note by the Court.*—Cooley's Constitutional Limitations, 301–303, (5th ed. 368, 369). A very full and interesting account of this discussion will be found in the works of John Adams, vol. 2, Appendix A, pp. 523–525; vol. 10, pp. 183, 233, 244, 256, &c., and in Quincy's Reports, pp. 469–482; and see *Paxton's Case*, do. 51–57, which was argued in November of the same year (1761). An elaborate history of the writs of assistance is given in the Appendix to Quincy's Reports, above referred to, written by Horace Gray, Jr., Esq., now a member of this court.

warrants by the Secretary of State, for searching private houses for the discovery and seizure of books and papers that might be used to convict their owner of the charge of libel. Certain numbers of the North Briton, particularly No. 45, had been very bold in denunciation of the government, and were esteemed heinously libellous. By authority of the secretary's warrant Wilkes's house was searched, and his papers were indiscriminately seized. For this outrage he sued the perpetrators and obtained a verdict of £1000 against Wood, one of the party who made the search, and £4000 against Lord Halifax, the Secretary of State who issued the warrant. The case, however, which will always be celebrated as being the occasion of Lord Camden's memorable discussion of the subject, was that of *Entick* v. *Carrington and Three Other King's Messengers*, reported at length in 19 Howell's State Trials, 1029. The action was trespass for entering the plaintiff's dwelling-house in November, 1762, and breaking open his desks, boxes, &c., and searching and examining his papers. The jury rendered a special verdict, and the case was twice solemnly argued at the bar. Lord Camden pronounced the judgment of the court in Michaelmas Term, 1765, and the law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time.*

As every American statesmen, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds

---

* *Note by the Court.*—See May's Constitutional History of England, vol. 3, (American ed., vol. 2) chap. 11 ; Broom's Constitutional Law, 558 ; Cox's Institutions of the English Government, 437.

of those who framed the Fourth Amendment to the Constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures. We think, therefore, it is pertinent to the present subject of discussion to quote somewhat largely from this celebrated judgment.

After describing the power claimed by the Secretary of State for issuing general search warrants, and the manner in which they were executed, Lord Camden says: " Such is the power, and, therefore, one would naturally expect that the law to warrant it should be clear in proportion as the power is exorbitant. If it is law, it will be found in our books; if it is not to be found there, it is not law.

" The great end for which men entered into society was to secure their property. That right is preserved sacred and incommunicable in all instances where it has not been taken away or abridged by some public law for the good of the whole. The cases where this right of property is set aside by positive law are various. Distresses, executions, forfeitures, taxes, &c., are all of this description, wherein every man by common consent gives up that right for the sake of justice and the general good. By the laws of England, every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my license, but he is liable to an action though the damage be nothing; which is proved by every declaration in trespass where the defendant is called upon to answer for bruising the grass and even treading upon the soil. If he admits the fact, he is bound to show, by way of justification, that some positive law has justified or excused him. The justification is submitted to the judges, who are to look into the books, and see if such a justification can be maintained by the text of the statute law, or by the principles of the common law. If no such excuse can be found or produced, the silence of the books is an authority against the defendant, and the plaintiff must have judgment. According to this reasoning, it is now incumbent upon the defendants to show the law by which this seizure is warranted. If that cannot be done, it is a trespass.

" Papers are the owner's goods and chattels; they are his

dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and, therefore, it is too much for us, without such authority, to pronounce a practice legal which would be subversive of all the comforts of society.

"But though it cannot be maintained by any direct law, yet it bears a resemblance, as was urged, to the known case of search and seizure for stolen goods. I answer that the difference is apparent. In the one, I am permitted to seize my own goods, which are placed in the hands of a public officer, till the felon's conviction shall entitle me to restitution. In the other, the party's own property is seized before and without conviction, and he has no power to reclaim his goods, even after his innocence is declared by acquittal.

"The case of searching for stolen goods crept into the law by imperceptible practice. No less a person than my Lord Coke denied its legality, 4 Inst. 176; and, therefore, if the two cases resembled each other more than they do, we have no right, without an act of Parliament, to adopt a new practice in the criminal law, which was never yet allowed from all antiquity. Observe, too, the caution with which the law proceeds in this singular case. There must be a full charge upon oath of a theft committed. The owner must swear that the goods are lodged in such a place. He must attend at the execution of the warrant, to show them to the officer, who must see that they answer the description. . . .

"If it should be said that the same law which has with so much circumspection guarded the case of stolen goods from mischief, would likewise in this case protect the subject by adding proper checks; would require proofs beforehand; would call up the servant to stand by and overlook; would require him to take an exact inventory, and deliver a copy: my answer is, that all these precautions would have been long

since established by law, if the power itself had been legal; and that the want of them is an undeniable argument against the legality of the thing."

Then, after showing that these general warrants for search and seizure of papers originated with the Star Chamber, and never had any advocates in Westminster Hall except Chief Justice Scroggs and his associates, Lord Camden proceeds to add:

"Lastly, it is urged as an argument of utility, that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shown, where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. It has been often tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence, there is no way to get it back but by action. In the criminal law such a proceeding was never heard of; and yet there are some crimes, such, for instance, as murder, rape, robbery, and house-breaking, to say nothing of forgery and perjury, that are more atrocious than libelling. But our law has provided no paper-search in these cases to help forward the conviction. Whether this proceedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it would seem, that search for evidence is disallowed upon the same principle. Then, too, the innocent would be confounded with the guilty."

After a few further observations, his Lordship concluded thus: "I have now taken notice of everything that has been urged upon the present point; and upon the whole we are all of opinion, that the warrant to seize and carry away the party's papers in the case of a seditious libel, is illegal and void." *

---

* *Note by the Court.*—See further as to searches and seizures, Story on the Constitution, §§ 1901, 1902, and notes ; Cooley's Constitutional Limitations, 299, (5th ed. 365) ; Sedgwick on Stat. and Const. Law, 2d Ed. 498; Wharton Com. on Amer. Law, § 560; *Robinson* v. *Richardson,* 13 Gray, 454.

The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other.

Can we doubt that when the Fourth and Fifth Amendments to the Constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of searches and seizures, and as furnishing the true criteria of the reasonable and "unreasonable" character of such seizures? Could the men who proposed those amendments, in the light of Lord Camden's opinion, have put their hands to a law like those of March 3, 1863, and March 2, 1867, before recited? If they could not, would they have approved the 5th section of the act of June 22, 1874, which was adopted as a substitute for the previous laws? It seems to us that the question cannot admit of a doubt. They never would have approved of them. The struggles against arbitrary power in which they had been engaged for more than twenty years, would have been too deeply engraved in their memories to have allowed them to approve of such insidious disguises of the old grievance which they had so deeply abhorred.

The views of the first Congress on the question of compelling

a man to produce evidence against himself may be inferred from a remarkable section of the judiciary act of 1789. The 15th section of that act introduced a great improvement in the law of procedure. The substance of it is found in § 724 of the Revised Statutes, and the section as originally enacted is as follows, to wit:

" All the said courts of the United States shall have power in the trial of actions at law, on motion and due notice thereof being given, to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, *in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery ;* and if a plaintiff shall fail to comply with such order to produce books or writings, it shall be lawful for the courts respectively, on motion, to give the like judgment for the defendant as in cases of nonsuit ; and if a defendant shall fail to comply with such order to produce books or writings, it shall be lawful for the courts respectively, on motion as aforesaid, to give judgment against him or her by default." *

The restriction of this proceeding to " cases and under circumstances where they [the parties] might be compelled to produce the same [books or writings] by the ordinary rules of proceeding in chancery," shows the wisdom of the Congress of 1789. The court of chancery had for generations been weighing and balancing the rules to be observed in granting discovery on bills filed for that purpose, in the endeavor to fix upon such as would best secure the ends of justice. To go beyond the point to which that court had gone may well have been thought hazardous. Now it is elementary knowledge, that one cardinal rule of the court of chancery is never to decree a discovery which might tend to convict the party of a crime, or to forfeit his property.† And any compulsory discovery by extorting the party's oath, or compelling the production of his

---

* *Note by the Court.*—Sixty-two years later a similar act was passed in England, viz., the act of 14 and 15 Vict., c. 99, § 6. See Pollock on Power of Courts to compel production of Documents, 5.

† *Note by the Court.*—See Pollock on Production of Documents, 27 ; 77 Law. Lib 12 [8].

private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom.

It is proper to observe that when the objectionable features of the acts of 1863 and 1867 were brought to the attention of Congress, it passed an act to obviate them. By the act of February 25, 1868, 15 Stat. 37, entitled "An act for the Protection in certain Cases of Persons making Disclosures as Parties, or testifying as Witnesses," the substance of which is incorporated in § 860 of the Revised Statutes, it was enacted "that no answer or other pleading of any party, and no discovery, or evidence obtained by means of any judicial proceeding from any party or witness in this or any foreign country, shall be given in evidence, or in any manner used against such party or witness, or his property or estate, in any court of the United States, or in any proceeding by or before any officer of the United States, in respect to any crime, or for the enforcement of any penalty or forfeiture by reason of any act or omission of such party or witness."

This act abrogated and repealed the most objectionable part of the act of 1867 (which was then in force) and deprived the government officers of the convenient method afforded by it for getting evidence in suits of forfeiture; and this is probably the reason why the 5th section of the act of 1874 was afterwards passed. No doubt it was supposed that in this new form, couched as it was in almost the language of the 15th section of the old judiciary act, except leaving out the restriction to cases in which the court of chancery would decree a discovery, it would be free from constitutional objection. But we think it has been made to appear that this result has not been attained; and that the law, though very speciously worded, is still obnoxious to the prohibition of the Fourth Amendment of the Constitution, as well as of the Fifth.

It has been thought by some respectable members of the profession that the two acts, that of 1868 and that of 1874, as being in *pari materia*, might be construed together so as to restrict

the operation of the latter to cases other than those of forfeit-
ure; and that such a construction of the two acts would obvi-
ate the necessity of declaring the act of 1874 unconstitutional.
But as the act of 1874 was intended as a revisory act on the
subject of revenue frauds and prosecutions therefor, and as it
expressly repeals the 2d section of the act of 1867, but does not
repeal the act of 1868, and expressly excepts criminal suits and
proceedings, and does not except suits for penalties and forfeit-
ures, it would hardly be admissible to consider the act of 1868
as having any influence over the construction of the act of
1874. For the purposes of this discussion we must regard the
5th section of the latter act as independent of the act of 1868.

Reverting then to the peculiar phraseology of this act, and
to the information in the present case, which is founded on it,
we have to deal with an act which expressly excludes criminal
proceedings from its operation (though embracing civil suits for
penalties and forfeitures), and with an information not techni-
cally a criminal proceeding, and neither, therefore, within the
literal terms of the Fifth Amendment to the Constitution any
more than it is within the literal terms of the Fourth. Does this
relieve the proceedings or the law from being obnoxious to the
prohibitions of either? We think not; we think they are
within the spirit of both.

We have already noticed the intimate relation between the
two amendments. They throw great light on each other.
For the "unreasonable searches and seizures" condemned in the
Fourth Amendment are almost always made for the purpose of
compelling a man to give evidence against himself, which in
criminal cases is condemned in the Fifth Amendment; and
compelling a man "in a criminal case to be a witness against
himself," which is condemned in the Fifth Amendment, throws
light on the question as to what is an "unreasonable search and
seizure" within the meaning of the Fourth Amendment. And
we have been unable to perceive that the seizure of a man's
private books and papers to be used in evidence against him is
substantially different from compelling him to be a witness
against himself. We think it is within the clear intent and
meaning of those terms. We are also clearly of opinion that

proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal. In this very case, the ground of forfeiture as declared in the 12th section of the act of 1874, on which the information is based, consists of certain acts of fraud committed against the public revenue in relation to imported merchandise, which are made criminal by the statute; and it is declared, that the offender shall be fined not exceeding $5000 nor less than $50, or be imprisoned not exceeding two years, or both; and in addition to such fine such merchandise shall be forfeited. These are the penalties affixed to the criminal acts; the forfeiture sought by this suit being one of them. If an indictment had been presented against the claimants, upon conviction the forfeiture of the goods could have been included in the judgment. If the government prosecutor elects to waive an indictment, and to file a civil information against the claimants —that is, civil in form—can he by this device take from the proceeding its criminal aspect and deprive the claimants of their immunities as citizens, and extort from them a production of their private papers, or, as an alternative, a confession of guilt? This cannot be. The information, though technically a civil proceeding, is in substance and effect a criminal one. As showing the close relation between the civil and criminal. proceedings on the same statute in such cases, we may refer to the recent case of *Coffey* v. *The United States, ante,* 436; in which we decided that an acquittal on a criminal information was a good plea in bar to a civil information for the forfeiture of goods, arising upon the same acts. As, therefore, suits for penalties and forfeitures incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; and we are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is com-

pelling him to be a witness against himself, within the meaning
of the Fifth Amendment to the Constitution, and is the equiva-
lent of a search and seizure—and an unreasonable search
and seizure—within the meaning of the Fourth Amendment.
Though the proceeding in question is divested of many of the
aggravating incidents of actual search and seizure, yet, as be-
fore said, it contains their substance and essence, and effects
their substantial purpose. It may be that it is the obnoxious
thing in its mildest and least repulsive form; but illegitimate
and unconstitutional practices get their first footing in that
way, namely, by silent approaches and slight deviations from
legal modes of procedure. This can only be obviated by ad-
hering to the rule that constitutional provisions for the security
of person and property should be liberally construed. A close
and literal construction deprives them of half their efficacy, and
leads to gradual depreciation of the right, as if it consisted more
in sound than in substance. It is the duty of courts to be
watchful for the constitutional rights of the citizen, and
against any stealthy encroachments thereon. Their motto
should be *obsta principiis.* We have no doubt that the legis-
lative body is actuated by the same motives; but the vast ac-
cumulation of public business brought before it sometimes pre-
vents it, on a first presentation, from noticing objections which
become developed by time and the practical application of the
objectionable law.

There have been several decisions in the Circuit and District
Courts sustaining the constitutionality of the law under consid-
eration, as well as the prior laws of 1863 and 1867. The prin-
cipal of these are *Stockwell* v. *United States,* 3 Clifford, 284; *In
re Platt and Boyd,* 7 Ben. 261; *United States* v. *Hughes,* 12
Blatchford, 553; *United States* v. *Mason,* 6 Bissell, 350; *United
States* v. *Three Tons of Coal,* 6 Bissell, 379; *United States* v.
*Distillery No. Twenty-eight,* 6 Bissell, 483. The first and lead-
ing case was that of *Stockwell* v. *United States,* decided by Mr.
Justice Clifford and Judge Shepley, the law under discussion
being that of 1867. Justice Clifford delivered the opinion, and
relied principally upon the collection statutes, which authorized
the seizure of goods liable to duty, as being a contemporaneous

exposition of the amendments, and as furnishing precedents of analogous laws to that complained of. As we have already considered the bearing of these laws on the subject of discussion, it is unnecessary to say anything more in relation to them. The learned justice seemed to think that the power to institute such searches and seizures as the act of 1867 authorized, was necessary to the efficient collection of the revenue, and that no greater objection can be taken to a warrant to search for books, invoices, and other papers appertaining to an illegal importation than to one authorizing a search for the imported goods; and he concluded that, guarded as the new provision is, it is scarcely possible that the citizen can have any just ground of complaint. It seems to us that these considerations fail to meet the most serious objections to the validity of the law. The other cases followed that of *Stockwell* v. *United States* as a precedent, with more or less independent discussion of the subject. The case of *Platt and Boyd*, decided in the District Court for the Southern District of New York, was also under the act of 1867, and the opinion in that case is quite an elaborate one; but, of course, the previous decision of the Circuit Court in the Stockwell case had a governing influence on the District Court. The other cases referred to were under the 5th section of the act of 1874. The case of *United States* v. *Hughes* came up, first, before Judge Blatchford in the District Court in 1875. 8 Ben. 29. It was an action of debt to recover a penalty under the customs act, and the judge held that the 5th section of the act of 1874, in its application to suits for penalties incurred before the passage of the act, was an *ex post facto* law, and therefore, as to them, was unconstitutional and void; but he granted an order *pro forma* to produce the books and papers required, in order that the objection might come up on the offer to give them in evidence. They were produced in obedience to the order, and offered in evidence by the district attorney, but were not admitted. The district attorney then served upon one of the defendants a subpœna *duces tecum*, requiring him to produce the books and papers; and this being declined, he moved for an order to compel him to produce them; but the Court refused to make such order. The books and

papers referred to had been seized under the act of 1867, but were returned to the defendants under a stipulation to produce them on the trial. The defendants relied not only on the unconstitutionality of the laws, but on the act of 1868, before referred to, which prohibited evidence obtained from a party by a judicial proceeding from being used against him in any prosecution for a crime, penalty, or forfeiture. Judgment being rendered for the defendant, the case was carried to the Circuit Court by writ of error, and, in that court, Mr. Justice Hunt held that the act of 1868 referred only to personal testimony or discovery obtained from a party or witness, and not to books or papers wrested from him; and, as to the constitutionality of the law, he merely referred to the case of Stockwell, and the judgment of the District Court was reversed. In view of what has been already said, we think it unnecessary to make any special observations on this decision. In *United States* v. *Mason*, Judge Blodgett took the distinction that, in proceedings *in rem* for a forfeiture, the parties are not required by a proceeding under the act of 1874 to testify or furnish evidence against themselves, because the suit is not against them, but against the property. But where the owner of the property has been admitted as a claimant, we cannot see the force of this distinction; nor can we assent to the proposition that the proceeding is not, in effect, a proceeding against the owner of the property, as well as against the goods; for it is his breach of the laws which has to be proved to establish the forfeiture, and it is his property which is sought to be forfeited; and to require such an owner to produce his private books and papers, in order to prove his breach of the laws, and thus to establish the forfeiture of his property, is surely compelling him to furnish evidence against himself. In the words of a great judge, "Goods, as goods, cannot offend, forfeit, unlade, pay duties, or the like, but men whose goods they are." *

The only remaining case decided in the United States courts

---

* *Note by the Court.*—Vaughan, C.J., in *Sheppard* v. *Gosnold*, Vaugh. 159, 172, approved by Ch. Baron Parker in *Mitchell qui tam* v. *Torup*, Parker, 227, 236.

·to which we shall advert is that of· *United States* v. *Distillery No. Twenty-eight.* In that case Judge Gresham adds to the view of Judge Blodgett, in *United States* v. *Mason*, the further suggestion, that as in a proceeding *in· rem* the owner is not a party, he might be compelled by a subpœna *duces tecum* to produce his books and papers like any other witness; and that the warrant or notice for search and seizure, under the act of 1874, does nothing more. But we cannot say that we are any better satisfied with this supposed solution of the difficulty. The assumption that the' owner may be cited as a witness in a proceeding to forfeit his property seems to us gratuitous. It begs, the question at issue. A witness, as well as a party, is protected by the· law from being compelled to give evidence that tends to criminate him, or to subject his property to forfeiture. *Queen* v. *Newell*, Parker, 269; 1 Greenleaf on Evid., §§ 451–453. But, as before said, although the owner of goods, sought to be forfeited by a proceeding *in rem*, is not the nominal party, he is, nevertheless, the substantial party to the suit; he certainly is so, after making claim and defence; and, in a case like the present, he is entitled to all the privileges ·which appertain to a person who is prosecuted for a forfeiture of his property by reason of committing a criminal offence.

We find nothing in the decisions to change our·views in relation to the principal question at issue.

We think that the notice to produce the invoice in this case, the order by virtue of which it was issued, and the law which authorized the order, were unconstitutional and void, and that the inspection by the district ·attorney of said invoice, when produced in obedience to said notice, and its admission in evidence' by the court, were erroneous and unconstitutional proceedings. We are of opinion, therefore, that

*The judgment of the Circuit Court should be reversed, and the cause remanded, with directions to award a new trial.*

MR. JUSTICE MILLER, with whom was the CHIEF JUSTICE, concurring:

I concur in the judgment of the court, reversing that of the Circuit Court, and in so much of the opinion of this court as

holds the 5th section of the act of 1874 void as applicable to the present case.

I am of opinion that this is a criminal case within the meaning of that clause of the Fifth Amendment to the Constitution of the United States which declares that no person "shall be compelled in any criminal case to be a witness against himself."

And I am quite satisfied that the effect of the act of Congress is to compel the party on whom the order of the court is served to be a witness against himself. The order of the court under the statute is in effect a subpœna *duces tecum,* and, though the penalty for the witness's failure to appear in court with the criminating papers is not fine and imprisonment, it is one which may be made more severe, namely, to have charges against him of a criminal nature, taken for confessed, and made the foundation of the judgment of the court. That this is within the protection which the Constitution intended against compelling a person to be a witness against himself, is, I think, quite clear.

But this being so, there is no reason why this court should assume that the action of the court below, in requiring a party to produce certain papers as evidence on the trial, authorizes an unreasonable search or seizure of the house, papers, or effects of that party.

There is in fact no search and no seizure authorized by the statute. No order can be made by the court under it which requires or permits anything more than service of notice on a party to the suit. That there may be no mistake as to the effect of the statute and the power to be exercised under it, I give the section here *verbatim:*

" SEC. 5. That in all suits and proceedings other than criminal arising under any of the revenue laws of the United States, the attorney representing the Government, whenever, in his belief, any business book, invoice, or paper, belonging to or under the control of the defendant or claimant, will tend to prove any allegation made by the United States, may make a written motion, particularly describing such book, invoice, or paper, and setting forth the allegation which he expects to prove; and thereupon the court in which suit or proceeding is

pending may, at its discretion, issue a notice to the defendant or claimant to produce such book, invoice, or paper, in court, at a day and hour to be specified in said notice, which, together with a copy of said motion, shall be served formally on the defendant or claimant, by the United States marshal, by delivering to him a certified copy thereof, or otherwise serving the same as original notices of suit in the same court are served; and if the defendant or claimant shall fail or refuse to produce such book, invoice, or paper in obedience to such notice, the allegations stated in the said motion shall be taken as confessed, unless his failure or refusal to produce the same shall be explained to the satisfaction of the court. And if produced, the said attorney shall be permitted, under the direction of the court, to make examination (at which examination the defendant or claimant, or his agent, may be present) of such entries in said book, invoice, or paper as relate to or tend to prove the allegation aforesaid, and may offer the same in evidence on behalf of the United States. But the owner of said books and papers, his agent or attorney, shall have, subject to the order of the court, the custody of them, except pending their examination in court as aforesaid." 18 Stat. 187.

Nothing in the nature of a search is here hinted at. Nor is there any seizure, because the party is not required at any time to part with the custody of the papers. They are to be produced in court, and, when produced, the United States attorney is permitted, under the direction of the court, to make examination in presence of the claimant, and may offer in evidence such entries in the books, invoices, or papers as relate to the issue. The act is careful to say that "the owner of said books and papers, his agent or attorney, shall have, subject to the order of the court, the custody of them, except pending their examination in court as aforesaid."

The Fourth Amendment says: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized."

The things here forbidden are two—search and seizure. And not all searches nor all seizures are forbidden, but only those that are unreasonable. Reasonable searches, therefore, may be allowed, and if the thing sought be found, it may be seized.

But what search does this statute authorize? If the mere service of a notice to produce a paper to be used as evidence, which the party can obey or not as he chooses is a search, then a change has taken place in the meaning of words, which has not come within my reading, and which I think was unknown at the time the Constitution was made. The searches meant by the Constitution were such as led to seizure when the search was successful. But the statute in this case uses language carefully framed to forbid any seizure under it, as I have already pointed out.

While the framers of the Constitution had their attention drawn, no doubt, to the abuses of this power of searching private houses and seizing private papers, as practiced in England, it is obvious that they only intended to restrain the abuse, while they did not abolish the power. Hence it is only *unreasonable* searches and seizures that are forbidden, and the means of securing this protection was by abolishing searches under warrants, which were called general warrants, because they authorized searches in any place, for any thing.

This was forbidden, while searches founded on affidavits, and made under warrants which described the thing to be searched for, the person and place to be searched, are still permitted.

I cannot conceive how a statute aptly framed to require the production of evidence in a suit by mere service of notice on the party, who has that evidence in his possession, can be held to authorize an unreasonable search or seizure, when no seizure is authorized or permitted by the statute.

I am requested to say that the CHIEF JUSTICE concurs in this opinion.