OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., Ruth P. Jones, John S. Tuttle and Gordon Betts, Plaintiffs,

v.

Federico F. PENA, Secretary U.S. Department of Transportation, Defendant.

No. 93–CV–1427.

United States District Court, District of Columbia.

Nov. 1, 1993.

Erika Z. Jones, Mayer, Brown & Platt, Washington, DC, for plaintiffs.

Kenneth L. Doroshow, U.S. Dept. of Justice, Washington, DC, for defendant.

## ORDER

VAN SICKLE, District Judge.

### A. *The Omnibus Act and the Pilot Program*

On October 28, 1991, Congress Enacted the Omnibus Transportation Employee Testing Act of 1991 (Omnibus Act), Pub.L. No. 102–143, tit. V, 105 Stat. 952. The Omnibus Act was intended to enhance transportation safety and to guard against the demonstrated dangers of drug and alcohol abuse through increased drug and alcohol testing, including random testing, of "individuals who are in-volved in the operation of aircraft, trains, trucks, and buses." *Id.,* 49 U.S.C.App. § 1434 (historical and statutory notes).

To this end, Section 5 of the Omnibus Act directed the Secretary of Transportation to select four states for participation in a one-year pilot test program (pilot program) for the purpose of "testing the operators of commercial motor vehicles on a random basis to determine whether an operator has used, in violation of law or Federal regulation, alcohol or a controlled substance." Pub.L. No. 102–143, § 5(b)(1), 105 Stat. 961, 49 U.S.C.App. § 2717 (historical and statutory notes). Congress intended to use the pilot program as a means of assessing "the effectiveness of State-administered testing in detecting individuals, such as owner-operators and independent drivers, who might otherwise avoid detection through ... carrier-administered testing...." S.Rep. No. 102–54, 102d Cong. 1st Sess. 34 (1991).

The pilot program is to last for one year, after which the Secretary of Transportation (Secretary) must report to Congress on the results of the program. Pub.L. 102–143, § 5(b)(5), 105 Stat. 961, 49 U.S.C.App. § 2717 (historical and statutory notes). The States selected to participate in the pilot program were Minnesota, Utah, Nebraska and New Jersey. Before passage of the Omnibus Act, the Federal Highway Administration (FWHA) had issued regulations requiring carrier-administered random drug testing; *i.e.,* random drug tests by employers of commercial vehicle operators. 49 C.F.R. §§ 391.81–391.123 (1989). The Omnibus Act ratified these regulations, *see* 49 U.S.C.App. § 2717(e), which were later found constitutionally permissible by the Ninth Circuit. *See International Brotherhood of Teamsters v. Department of Transportation,* 932 F.2d 1292 (9th Cir.1991).

Although funding for the pilot program is provided by the Secretary, the actual implementation and testing is to be done by the four participating states, according to each state's own plan for the enforcement of motor-vehicle safety rules. Pub.L. 102–143, § 5(b)(1). Specifically, as provided in the Omnibus Act, the pilot program is to be

administered under the Motor Carrier Safety Assistance Program (MCSAP), a program established by prior legislation for the purpose of providing grants to states to enforce rules and regulations concerning commercial motor-vehicle safety, primarily through roadside inspections. *Id.; see also* 49 U.S.C.App. § 2302(a) (1988) (authorizing grants to states for enforcement programs applicable to commercial motor-vehicle safety); 49 C.F.R. Part 350 (MCSAP regulations). To qualify for grants under the MCSAP, the states selected had to submit an enforcement plan and provide assurances that they had the necessary legal authority to carry out the plan. 49 U.S.C.App. § 2302(b)(1)(B), (D).

The pilot program states differ in their selection of testing sites. Although no state conducts roving stops, the state enforcement plans differ as to whether testing is done at fixed sites where other regulatory activity is also conducted (such as truck weighing, vehicle inspection and document inspection), or at fixed sites established solely for drug and alcohol testing. Under the Utah plan, testing is confined to eight "Ports of Entry" which are facilities used for truck-weighing and vehicle and document inspections. Cullen Aff., Exh. 4 at 234. The Ports of Entry to be used for testing, as well as the time periods in which testing will occur, are selected by computer according to a formula that measures the volume of traffic at each Port of Entry and time period. *Id.* at 239–40. The other three states also use existing sites at which truck weighing or inspection of vehicles or driver documents is already conducted but, unlike Utah, they retain the discretion to establish new sites solely for drug or alcohol testing. *Id.* at 257, 290, 336–37. In these three states, drug and alcohol tests are conducted in conjunction with standardized commercial vehicle and driver inspections. *Id.* at 255–56, 294, 334, 336.

The states also differ in how drivers are randomly selected for testing. In Utah, as each drug test nears completion, the official who conducts the test notifies the Port of Entry Agent, who then directs a computer to select the next driver randomly from the vehicles passing through the port, according to a preset formula. *Id.* at 239. The other

three states enforcement plans provide for a random-number table to make random selections. *Id.* at 267, 271, 293–94, 303–04, 337–38. In Minnesota, a supervisor may adjust the random vehicle selection procedure, if necessary in light of traffic back-ups, highway-safety considerations, or operational conditions. *Id.* at 267.

The states also differ as to the consequences of refusal to take a test. New Jersey provides drivers with a notice advising them that a refusal to take the test causes the employer to be notified that "one of its drivers" declined to participate. *Id.* at 354–55. The driver is then asked to indicate whether he wants his identity disclosed in the notice to the employer. *Id.* at 355. After receiving the notice, the employer may request additional information but, if the driver has asked that his identity not be disclosed, that request will be honored. *Id.* at 352–53.

In the other three states, the employer is notified of the identity of the driver who refused to take the test. *Id.* at 243, 278, 300. Under the Minnesota plan, the letter sent to the employer identifies the employee who refused the test and describes the program as "an experimental test program" that is "strictly voluntary," noting further that, if the tests were mandatory, sanctions would have been imposed for the refusal to submit. *Id.* at 278. In Utah, a refusing driver can be ordered out of service for twenty-four hours. *Id.* at 243. The Nebraska plan does not provide any penalties for refusal. The Minnesota and New Jersey plans similarly impose no consequences for refusal to submit to the test, other than the employer notification described above.

Each state follows drug testing procedures similar to those found in 49 C.F.R. Part 40, which govern random drug testing administered by trucking companies to their employees, and which have been upheld by the Ninth Circuit. *Id.* at 241–42, 259–60, 293, 304, 346–48; *International Brotherhood of Teamsters v. Department of Transp.,* 932 F.2d 1292, 1295–96 (9th Cir.1991). These include a guarantee of privacy during specimen collection, *see* Cullen Aff., Exh. 4 at 241, 259, 295, 346; chain-of-custody procedures to

protect the integrity of the specimen, *id.* at 241, 259–60, 296–97, 346; use of laboratories certified by the National Institute for Drug Abuse, *id.* at 241, 293, 346–47; and an opportunity for an individual to explain positive test results to a Medical Review Officer, *id.* at 241–42, 260, 261, 300–302, 348.

The state plans deviate somewhat from the federal drug testing regulations because, unlike the scheme contemplated by the regulations, testing under the state plans is not administered by employers. Instead, the person conducting or overseeing the testing is an employee of the state or a contractor.

Under all four states' plans, the results are reported to FHWA's contractor, which uses the results "for statistical summary and analysis." *Id.* at 348. Neither the FHWA nor its contractor is privy to the names of the drivers associated with positive results.

### B. *Litigation History*

This case was originally in the United States Court of Appeals for the District of Columbia Circuit as a Petition for Review of Orders of the Secretary of Transportation and the Administrator, Federal Highway Administration, entitled *Owner–Operator Drivers Association, Inc., et al. v. Federico F. Pena, Secretary, U.S. Department of Transportation, et al.,* No. 92–1662. On June 18, 1993, the D.C. Circuit dismissed the petition as not qualifying for initial consideration by a court of appeals under the Hobbs Act, 28 U.S.C. § 2342.

On July 9, 1993, plaintiffs filed this action in the United States District Court for the District of Columbia.

The defendants, seeing no issue of controverted fact, moved for summary judgment under Fed.R.Civ.P. 12(c). Plaintiffs responded with a cross-motion for summary judgment.

### C. *Issues*

The case is presented by both parties as raising only legal issues that may be resolved without reference to facts beyond the statutory program. Plaintiffs allege that they have been adversely affected or aggrieved by the following actions of defendants:

a) authorizing and providing federal funds to support random, warrantless, non-consensual searches of operators of motor trucks moving in interstate commerce without probable cause or reasonable suspicion by state law enforcement officers acting under the color of federal law and with the benefit of federal funds, said searches including the requirement that operators submit to breath tests and the production of urine samples for the purpose of detecting the presence of alcohol and/or the use of controlled substances; and

b) failing to promulgate regulations, or insisting that participating states promulgate regulations as a condition of their federal grants, limiting the discretion of the officers in the field, establishing limits on the intrusion involved and protecting the privacy interest and the constitutional right of motor truck operators to be free from unreasonable searches and seizures.

Complaint of *Owner–Operator Independent Drivers Association, Inc., et al.* in Civil Action No. 93–1427, filed in the United States District Court for the District of Columbia on July 9, 1993. Plaintiffs allege such actions violate their rights under Article I, Section 8, Clause 1 (Spending Clause) of, and the Fourth Amendment to the United States Constitution.

Plaintiffs characterize their case as a facial Constitutional challenge. The ultimate issue, therefore, is whether Section 5 of the Omnibus Transportation Employee Testing Act of 1991, Pub.L. No. 102–143, tit. V § 5(b)(1), (2), (3) & (4) 105 Stat. 961, when considered in light of the relevant Federal regulations and selected state procedures (which for the purpose of the testing, must comply with all relevant federal statutes and regulations), subjects commercial truck operators to unreasonable searches[1] and

---

**1.** A Fourth Amendment search occurs when a sample of urine is taken. *See International*

*Brotherhood of Teamsters, et al. v. Department of*

seizures[2].

### D. *District Court Jurisdiction*

■ Although the defendants claim that there is no justiciable issue before the court, the testing program is still ongoing. More specifically, while all four states envisioned a two-year test, *See* Cullen Aff., Exh. 4, 207, 250, 280, 328, the completion date of actual testing for each state is as follows:

| Nebraska | September 25, 1993 |
|---|---|
| Minnesota | September 30, 1993 |
| Utah | October 30, 1993 |
| New Jersey | December 31, 1993 |

(*See* Supplemental Declaration of James D. McCauley, dated September 30, 1993.)

■ Furthermore, this court finds it has jurisdiction to consider the claims presented. The district courts have original jurisdiction of any civil action arising under any Act of Congress regulating commerce. *See* 28 U.S.C. § 1337(a). Sovereign immunity will not bar an action against a federal officer who was acting within the scope of his authority if it is claimed, as it is in this case, that the statute upon which his or her actions were based is unconstitutional. *See Larson v. Domestic and Foreign Commerce Corporation,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *see also,* 14 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3655 at 227–29 (discussing *Larson* and its progeny and reciting that "the basic exceptions to sovereign immunity as applied to federal officer arise . . . when the officer, although within the scope of his authority, act[s] unconstitutionally. . . .").

### E. *Discussion of Merits*

We turn to the central issue—whether the Secretary violated that portion of the Fourth Amendment to the Constitution prohibiting unreasonable searches and seizures. The secretary's actions were taken pursuant to 49 U.S.C.App. § 2717(a), which provides that the Secretary shall "in the interest of commercial motor vehicle safety, issue regulations . . . establish[ing] a program which requires motor carriers to conduct . . . random . . . testing of the operators of commercial

*Transportation,* 932 F.2d 1292, 1299 (9th Cir. 1991).

**2.** A Fourth Amendment seizure occurs when a vehicle is stopped at a checkpoint. *Michigan*

motor vehicles for use . . . of alcohol or a controlled substance."

The safety problems related to commercial motor vehicles are real and extreme. The highway system now handles an enormous load of private vehicles. Interspersed among those vehicles are a large number of commercial motor vehicles, many of which are eighteen-wheel semitrailer-tractor units, and some of which are actually motor trains consisting of up to four separate units. These commercial vehicles put such strain on the roadbeds that they can and do cause dangerous ruts in the macadam and concrete pavement. In addition the motor trains do not run on separate roadbeds as do railway trains. Instead they move among private vehicles, at speeds as great or greater than those much smaller vehicles.

Further, as Justice Blackmun observed in 1971, "slaughter on the highways of this Nation exceeds the death toll of all our wars." *Perez v. Campbell,* 402 U.S. 637, 657, 91 S.Ct. 1704, 1715, 29 L.Ed.2d 233 (1971).

Therefore, it is imperative that the Secretary develop some statistical information as to the magnitude of the risks involved.

■ It is clear that there is a special governmental interest in investigating the use of drugs by commercial motor vehicle drivers. The weight of this interest must be balanced against the intrusion involved in this case:

> [W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is

*Department of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990).

necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

*Treasury Employees v. Von Raab,* 489 U.S. 656, 665–66, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1988). The balancing of interests must be applied to both the search (the collecting of the urine) and the seizure (the stop). In exercising this balancing duty, we must consider the "Slippery Slope" principle,[3] i.e., that every relaxation of a constitutionally imposed restraint is an invitation to justify some other or further relaxation of that restraint. An excellent expression of this principle is found in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). In that case, Justice Bradley wrote:

> ... illegitimate and unconstitutional practices get their first footing ... by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis* (resist the first approaches or encroachments).

*Id.* at 635, 6 S.Ct. at 535.

[7] As to the problem of the search, we recognize that ordinarily, a search without a warrant must be based on probable cause. However, the probable cause standard is peculiarly related to criminal investigations. The traditional probable cause standard may be unhelpful in analyzing the reasonableness of routine administrative functions, especially where the government seeks to *prevent* the development of hazardous conditions, or to detect violations that rarely generate articulable grounds for searching any person. *See Von Raab,* 489 U.S. at 668, 109 S.Ct. at 1392. The test results produced by the search in this case are not intended to serve as the basis for imposing criminal penalties. In fact, under the federal standard previously referred to, the results of the search are treated with extreme confidentiality, and, at most, can form only the basis for a reasonable suspicion, which in turn would require a warrant or otherwise justifiable independent search. 49 U.S.C.App. § 2717(d)(7) requires the Secretary to develop standards which shall:

> provide for the confidentiality of test results and medical information (other than information relating to alcohol or a controlled substance) of employees, except that the provisions of this paragraph shall not preclude the use of test results for the orderly imposition of appropriate sanctions under this section;

There is the further problem of the use of state troopers to collect the urine specimens in Nebraska, Minnesota, and New Jersey. But the experience of furnishing urine for medical testing purposes is not so rare or unique as to cause any adult serious trepidation about complying. In addition, commercial vehicle operators are already required to tolerate substantial privacy invasions as a prerequisite to their qualification for, and exercise of, the privilege of operating commercial vehicles. One of the conditions for qualification is the production of a urine sample.

▮ This court concludes that the random search program mandated by 49 U.S.C.App. § 2717 is not prohibited as unreasonable under the Fourth Amendment.

▮ The problem of the seizure warrants even less discussion. Drivers of commercial vehicles are presently required to make routine stops at established weigh stations and other established check points to face investigations by state troopers. They are hardly novices to the experience. Furthermore, any

---

**3.** *See* Yale Kamisar, *When is There a Constitutional "Right to Die"? When is There No Constitutional "Right to Live"?* 25 Ga.L.Rev. 1203, 1205.

trepidation alleged by commercial vehicle operators, must be measured by the emotional experience of an operator who is not in violation of the laws and regulations. To paraphrase the words of Chief Justice Rehnquist:

We believe the Michigan courts misread our cases concerning the degree of "subjective intrusion" and the potential for generating fear and surprise. The "fear and surprise" to be considered are not the natural fear of one who has been [using drugs] over the prospect of being stopped at a [drug testing] checkpoint but, rather, the fear and surprise engendered in law abiding motorists by the nature of the stop.

*Michigan State Police Dept. v. Sitz*, 496 U.S. 444, 452, 110 S.Ct. 2481, 2486, 110 L.Ed.2d 412 (1990).

This court has previously, on the record made in open court, granted the motion of American Trucking Association, Inc., for leave to participate as Amicus Curiae.

For the above reasons,

IT IS ORDERED that:

1. Defendants' motion for summary judgment of dismissal on the merits is granted.

2. Plaintiffs' motion for summary judgment on the merits is denied.