## Commonwealth v. Kekic.

*Constitutional law—Searches and seizures—Intoxicating liquors—Manufacture—Seizure—Arrest—Return of property unlawfully taken.*

1. The constitutional right of the citizen to be protected against unlawful searches and seizures is violated when officers of the law enter his house and arrest him without warrant of either search and seizure or arrest, and thereupon seize a still and other implements with which he has been engaged in the unlawful manufacture of intoxicating liquor.

2. Where one is engaged in making intoxicating liquors in his own home at night without disorder, he may not be arrested without a warrant by police officers who have broken into his house to verify their suspicions that he was violating the liquor law, there being nothing to show any likelihood that he would have escaped had they waited to obtain a warrant.

3. A defendant charged with violating the liquor law, who has been arrested without a warrant, and whose property has been illegally seized, is entitled to have his property returned to him and to have an order made restraining the officers from giving or furnishing testimony as to what they found or discovered in his home at the time.

Rule to show cause why articles seized should not be returned to defendant and officers restrained from testifying thereto. Q. S. Dauphin Co., Sept. Sess., 1922, No. 257.

*Robert Stucker,* for rule.

*E. Le Roy Keen,* Assistant District Attorney, and *Philip S. Moyer,* District Attorney, contra.

Fox, J., April 30, 1923.—The petition of the defendant in the above stated case, in substance, sets forth that on Friday, Oct. 6, 1922, an information was made against him, charging him with "unlawfully manufacturing intoxicating liquors and the unlawful possession of intoxicating liquors," and that upon hearing before a justice of the peace the next day, he was bound over to appear at the next Quarter Sessions Court of Dauphin County; that previous to the information, to wit, on Oct. 5, 1922, at about 10.30 o'clock at night, two policemen of the Borough of Steelton, John H. Whitney and Dmiter Kajgnic, entered his home, of which he was in the quiet and peaceable possession, at No. 763 South 4th Street, Steelton, without warrant, either to arrest or to search, and against his protest; the one, Whitney, first entered by the opening of a shutter and window, and placed him under arrest and took from his house a ten-gallon still, one wooden bucket, a small quantity of grape mash, two buckets, one spoon, one oil stove, one wrench and ten gallons of distilled brandy, all of which is to be used as evidence against him in a prosecution founded upon the information referred to. Upon the presentation of the petition, a rule was granted upon Philip S. Moyer, the District Attorney of Dauphin County; Victor Grove, Chief of Police; John H. Whitney and Dmiter Kajgnic, police officers, and John H. Gibbs, constable, of Steelton, to show cause why the articles above mentioned should not be returned to the petitioner, and why the above mentioned police officers, Whitney and Kajgnic, should not be restrained from giving or furnishing any testimony as to what they found or discovered in the home of the petitioner on the night of Oct. 5, 1922, in any proceeding in which the petitioner is charged with criminal offence.

An answer was filed by Philip S. Moyer, Esq., only, in which, in substance, it is alleged that the said officer, Whitney, saw through an open window a lighted oil stove and observed the unlawful manufacture of intoxicating liquor, and called to the defendant from the outside and placed him under arrest; that Officer Whitney entered through the open window into the room where

the still and other articles were located, and then and there lawfully seized the aforementioned articles with the assistance of the other officer, Kajgnic, and in which it was denied that the defendant was illegally arrested on the charge of unlawfully manufacturing and the unlawful possession of intoxicating liquor, and also that the said goods and chattels mentioned in the petition were unlawfully seized at said premises at the time of the arrest of said defendant on Oct. 5, 1922.

Depositions were taken in the case, and they are in some respects contradictory. The defendant and his wife say that the shutter and window in the rear of the house, through which the officer, Whitney, entered, were closed, and that he opened the same and therein entered with a revolver in one hand and a flash-light in the other, and pointed the revolver at the defendant, placed him under arrest and requested him to turn on the light, and, after he had done this, ordered him, the defendant, to open the door, whereupon Officer Kajgnic came in. Officer Whitney denies that he opened the shutter and the window, but says that they were open, and that there was a reflection from the oil stove, which was connected with the still and supplied the light by which he could see into the room, and saw the still in operation before he entered the house.

After carefully reading the depositions, we find some of the facts to be: That the defendant had his home on Oct. 5, 1922, at No. 763 South 4th Street, Steelton; that the officers, having previously been told that there was something going on at the home of the defendant which was wrong, went there at about half-past 10 o'clock at night; that the officer, Whitney, went through the residence of a neighbor into the latter's back yard, and then entered the defendant's house through a rear window without a warrant, either of search and seizure or arrest, and without the request or consent of the defendant so to do. The other officer, Kajgnic, remained in front of the defendant's house until the door was opened, when he entered without any warrant, received the defendant in custody from Whitney, who then seized and took possession of the goods and chattels mentioned above of the defendant.

The questions now before us are: (1) Were the still and other articles lawfully seized by the officers, and are they now being lawfully held for the purpose of offering the same in evidence in the criminal charge against the defendant? (2) Was the arrest a legal one?

Article I, § 8, of the Constitution of Pennsylvania provides as follows: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

This section is almost identical with article IV of the Constitution of the United States.

The provisions of the Federal Constitution secure the citizen, in his person, home and property, from unwarranted and unlawful search and seizure on the part of officers and agents of the Federal Government, and those of the State Constitution likewise secure him from such unlawful conduct and invasion on the part of the State and its officers. Under both, the citizen shall be secure in his person, his home and his property from unlawful invasion, unlawful search and unlawful seizure. This is one of the fundamentals of our free government.

The first question we have under consideration has more frequently been raised under the Federal than under our State Constitution, and, therefore,

3 D. & C.

we find a greater field of discussion and authority applicable under the former; but that which has been judicially determined in the courts of either is authority.

The reasons for the provisions in our constitutions relating to this subject are interesting and illuminating.

In England, beginning with the Star Chamber and followed by the Secretary of State, writs of assistance were issued, under authority of which officers of the King entered any man's premises agreeable to their will, without having named in the writ the person to be searched and specifying therein the premises to be invaded or the object thereof. This practice prevailed for many years, though constantly objected to by many, but not contested and pronounced unlawful until in the case of Entick *v.* Carrington and Three Other King's Messengers: 10 Howell's State Trials, 1029. The case was that of entering the plaintiff's dwelling-house and breaking open his desks, boxes, &c., and searching and examining his papers, and Lord Camden pronounced that such conduct on the part of the officers of the King was contrary to the principles of the English people and could not be tolerated. In his opinion, after describing the power claimed by the Secretary of State for issuing general search warrants and the manner in which they were executed, Lord Camden, *inter alia,* says:

"Such is the power, and, therefore, one should naturally expect that the law to warrant it should be clear in proportion as the power is exorbitant. If it is law, it will be found in our books; if it is not to be found there, it is not law.

"The great end for which men entered into society was to secure their property. That right is preserved sacred and incommunicable in all instances where it has not been taken away or abridged by some public law for the good of the whole. The cases where this right of property is set aside by positive law are various. Distresses, executions, forfeitures, taxes, &c., are all of this description, wherein every man by common consent gives up that right for the sake of justice and the general good. By the laws of England, every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my license, but he is liable to an action though the damage be nothing; which is proved by every declaration in trespass where the defendant is called upon to answer for bruising the grass and even treading upon the soil. If he admits the fact he is bound to shew, by way of justification, that some positive law has empowered or excused him. The justification is submitted to the judges, who are to look into the books and if such a justification can be maintained by the text of the statute law or by the principles of common law. If no such excuse can be found or produced, the silence of the books is an authority against the defendant, and the plaintiff must have judgment. According to this reasoning, it is now incumbent upon the defendants to shew the law by which this seizure is warranted. If that cannot be done, it is a trespass.

"Papers are the owner's goods and chattels; they are his dearest property; and are so far from enduring a seizure that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and, therefore, it is too much for us, without such authority, to pronounce a practice legal which would be subversive of all the comforts of society.

Commonwealth v. Kekic.

"But though it cannot be maintained by any direct law, yet it bears a resemblance, as was urged, to the known case of search and seizure for stolen goods. I answer that the difference is apparent. In the one, I am permitted to seize my own goods, which are placed in the hands of a public officer, till the felon's conviction shall entitle me to restitution. In the other, the party's own property is seized before and without conviction, and he has no power to reclaim his goods even after his innocence is declared by acquittal.

"The case of searching for stolen goods crept into the law by imperceptible practice. . . . No less a person than my Lord Coke denied its legality, 4 Inst. 176, and, therefore, if the two cases resembled each other more than they do, we have no right, without an Act of Parliament, to adopt a new practice in the criminal law which was never yet allowed from all antiquity. Observe, too, the caution with which the law proceeds in this singular case. There must be a full charge upon oath of a theft committed. The owner must swear that the goods are lodged in such a place. He must attend at the execution of the warrant to shew them to the officer, who must see that they answer the description. . . .

"Lastly, it is urged as an argument of utility, that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shewn where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. It has been often tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence there is no way to get it back but by action. In the criminal law such a proceedings was never heard of; and yet there are some crimes, such, for instance, as murder, rape, robbery and housebreaking, to say nothing of forgery and perjury, that are more atrocious than libelling. But our law has provided no paper search in these cases to help forward the conviction. Whether this proceedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem that search for evidence is disallowed upon the same principle. There, too, the innocent would be confounded with the guilty."

Of this judgment, in the case of Boyd v. United States, 116 U. S. 616, Mr. Justice Bradley, in the opinion of the court, said:

"Lord Camden pronounced the judgment . . . and the law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time," also "the principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offence, but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction

3 D. & C.

of some public offence—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation, but any forcible and compulsory extortion of a man's own testimony or of his private papers, to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the 4th and 5th Amendments run almost into each other.

"Can we doubt that when the 4th and 5th Amendments to the Constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of seaches and seizures, and as furnishing the true criteria of the reasonable and 'unreasonable' character of such seizures?"

And on pages 624 and 625 we find the following language:

"In order to ascertain the nature of the proceedings intended by the 4th Amendment to the Constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law that ever was found in an English law book,' since they placed 'the liberty of every man in the hands of every petty officer.' . . . This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'

"These things, and the events which took place in England immediately following the argument about writs of assistance in Boston, were fresh in the memories of those who achieved our independence and established our form of government."

The events and reasons bringing about the disuse of these general writs in this country and the adoption of the 4th Amendment are described by Watson on the Constitution, in vol. 2, page 1415, as follows:

"While the officers of the Crown were issuing and serving such warrants in England, they were doing the same in the American colonies, and this contributed much to the public sentiment which eventually demanded the adoption of this amendment. So oppressive had become the practice that here, as in England, it caused great alarm among the people, and here, as there, resistance was made to such writs on the ground of their illegality. These warrants were principally issued and the seizures made in the colony of Massachusetts. The trial which tested their legality occurred in Boston in February, 1761. It proved to be more than a mere trial, as we shall see, for the greatest question which could affect the interests of the colonists was involved. James Otis, a native of Massachusetts, was Advocate General of the Crown at Boston, a legal position of great responsibility and honor; but he was so wrought up at the outrage which had been committed by the arrests under these warrants that he resigned his office, and, though offered a most remunerative fee if he would take charge of the defence, he said: 'In such a cause as this I despise a fee.' He then acted as one of the counsel in resisting the arrests. He spoke for five hours, and it is doubtful if any legal argu-

ment ever made on this continent produced a more profound or lasting impression. He set fire to a torch which is still burning, and which will continue to burn, for in that masterful effort he impressed upon the American heart the great lesson of resistance to tyranny and outrage. As the result of the trial, the writs were never afterwards served by judicial sanction."

In 1766 the House of Commons, after full debate, passed resolutions condemning the issuance of the writs of assistance or general warrants. It was in the debate on these resolutions that Lord Chatham declared: "Every man's house is called his castle. Why? Because it is surrounded by a moat or defended by a wall? No. It may be a straw-built hut, the winds may whistle around it, the rain may enter it, but the King cannot."

The subject of search and seizures may be further studied with profit in Cooley's Constitutional Limitations (7th ed.), 426, and in Story on the Constitution.

We have thus at length gone into the origin of, and the reasons for, our Federal constitutional provision upon the subject of search and seizure, the language of which is almost identical with that of our State Constitution. They both intend to secure the individual in his person, home and property from invasion through intolerable legislation, and from invasion through over-zealous, misguided or corrupt, unrestrained administrators of the law.

In the construction of the 4th and 5th Amendments of our Federal Constitution, four cases stand out as being the leading ones and which clearly set forth the rules, both with respect to search and seizure and the reception of evidence secured unlawfully, as laid down by the Supreme Court of the United States. These cases are Boyd v. United States, 116 U. S. 616; Adams v. New York, 192 U. S. 585; Weeks v. United States, 232 U. S. 383, and Gouled v. United States, 255 U. S. 298, from which cases two rules have been deducted, viz.:

1. "It is the duty of courts to be watchful for the constitutional rights of the citizen and against any stealthy encroachment thereon.

2. "In the trial of a criminal case, the court will not take notice of the manner in which witnesses have possessed themselves of papers or other articles of personal property, which are material and properly offered in evidence, unless the facts of the case require it to do so."

Both of these rules have been followed by the Federal Government without variance, and by most of the states, including our own; the first rule in the case of Germantown Trust Co. et al. v. Powell, 260 Pa. 181, and the second in the case of Com. v. Vigliotti, 75 Pa. Superior Ct. 366, and affirmed by the Supreme Court, both recently decided [271 Pa. 10; 258 U. S. 403].

Officers of the law, where circumstances will permit, should be armed with a warrant of arrest and a warrant of search. Where there is ground for suspicion that one is violating the law, an officer should procure a warrant of arrest and a warrant of search and seizure with full specifications. An officer without such warrants may not obtain entrance to a man's house by force or by show of force, or by threat, amounting to coercion, or by stealth, and arrest the citizen and search his premises and seize his personal property. If he thus acts, it is a violation of the constitutional rights of the citizen: Vide Gouled v. United States, 255 U. S. 298. Cooper, J., in the case of Connelly v. United States, 275 Fed. Repr. 509, says: "The Supreme Court of the United States held 'that the 4th and 5th Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon, or 'gradual depreciation' of, the rights secured by them by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers, that papers

3 D. & C.

so secured cannot be used, and that it makes no difference whether they have pecuniary value or not.' "

In the case of Connelly v. United States, 275 Fed. Repr. 509, decided Aug. 4, 1921, it was held that intoxicating liquor cannot be seized without warrant, and must be returned to the owner. The fact that prohibition agents had evidence of the sale of intoxicating liquors in a private dwelling did not legalize their search of the dwelling without first obtaining a search warrant, as required by the National Prohibition Act, title 2, par. 25, and liquor unlawfully seized therein is not admissible in evidence in a prosecution against the owner, and will be ordered returned, on motion.

In this case it may be said that the officers had reason to believe the defendant was violating the liquor law of this State before they entered his house. There is nothing in the depositions to show that there was any danger of the defendant escaping and removing the still and liquor before a warrant of arrest and a warrant of search could have been obtained. They entered his home, not upon the invitation of the defendant, nor with his consent, but the one entered through a window, while the other one was guarding the doorway, when the defendant was in bed, and with his hand upon his pistol the officer, Whitney, commanded the wife of the defendant to turn on the electric light and placed the defendant under arrest, called in the other officer, placed the defendant in the custody of this other officer, searched the premises and seized the personal property in question.

It cannot be said that it was a peaceful and lawful entry because the defendant made no objection; there is no suggestion that had he objected they would have desisted. On the contrary, it is quite probable that had he protested and resisted, the officers would have been just as aggressive or more so in their actions. We are afforded proper procedure for the lawful search of the homes of violators of the law and seizures of their property, and it must be followed in a reasonable manner under the circumstances.

In the case of United States v. Rembert, 284 Fed. Repr. 996, the question was fully considered whether prohibition officers, without warrant and without knowledge of or probable cause to suspect a violation of the prohibition law, have the right on a public highway to stop a car and make search thereof, the court, inter alia, decided "no general exploratory search or seizure of either persons, houses or effects can ever be justified with or without a warrant," and, in speaking of the effect of the citizen not forcibly resisting the action, but submitting thereto, said:

"The courts have repeatedly held such action will not be taken to be a consent to an unlawful search or arrest, but merely a peaceful submission to officers of the law: United States v. Slusser (D. C.), 270 Fed. Repr. 818; Youman v. Com., 189 Ky. 152, 224 S. W. Repr. 860, 13 Am. Law Reps. 1303; Amos v. United States, 255 U. S. 313, 41 Sup. Ct. 266, 65 Law Ed., 654.

"Any other course on the part of the citizen would place him in the difficult and dangerous position of undertaking to protect by force the rights which, in his opinion, the officers are seeking to impair, when it may turn out that the officer in fact has the authority, and his action may, in fact, be legal. This principle that the courts of the United States will not put the citizen to the alternative of contesting by force with officers or waiving his constitutional rights, runs throughout the Federal decisions, and gives character and meaning to their emphatic holding that evidence illegally obtained cannot be used, and that the submission of a citizen to the officer cannot deprive him of his constitutional rights unless the evidence clearly shows that the submission

Commonwealth v. Kekic.

was really voluntary and with a desire to invite search and not done merely to avoid resistance.

"In this case, therefore, the defendant, Rembert, has lost no right by his failure to forcibly resist the officers, and if the action of the officers was illegal, the fact that intoxicating liquor was found in his car does not in any manner prejudice him on this motion.

"United States v. Slusser (D. C.), 270 Fed. Repr. 818, 819, puts the matter very well thus:

" 'An unlawful search cannot be justified by what is found. A search that is unlawful when it begins is not made lawful when it ends by the discovery and seizure of liquor. It was against such prying on the chance of discovery that the constitutional amendment was intended to protect the people.' "

We think in the case at bar the action of the officers was a clear and unwarranted invasion of the defendant's indefeasible right of personal security, personal liberty and private property under our fundamental law and cannot be approved.

My brother, President Judge Hargest, in the case of Com. v. Eitler, March Sessions, 1922, No. 50, reported in 25 Dauphin Co. Reps. 343, 2 D. & C. 33, delivered a very exhaustive and learned opinion on the question of search and seizure as bearing upon the right of an officer armed with a warrant to search a defendant's house for fire-arms only to seize intoxicating liquors found therein while making such search. He therein held such a seizure of liquors to be a violation of the constitutional rights of the defendant, but that on the trial of the defendant on an indictment charging him with the unlawful possession of intoxicating liquors for beverage purposes, the court would not halt the trial to inquire into how the evidence was obtained, and that the proper method is that the defendant before trial make a motion that the liquors thus taken be restored to him.

Much of what we say here was said by my learned colleague in the Eitler case. But the subject at the present time is so frequently presented to the officers of the law and before the public that a complete, full and general knowledge of the law pertinent thereto should be possessed. So, therefore, we, at the risk of repetition and of being prolix, dwell upon the subject at somewhat great length.

The answer to the first question is that the search and seizure were illegal.

The defendant in this case before the trial has made an application for an order directing the return to the applicant of the property thus unlawfully seized. Such proceeding is timely and proper. Thus proceeding, the question of the illegal seizure may be fully heard and the trial is not halted by the interposition of a collateral matter which we could not at the time of the trial stop to consider. This is the rule of our own State, as expressed in the case of Com. v. Vigliotti, 75 Pa. Superior Ct. 366. "If upon such a motion the court erroneously refuses to direct the return of the personal chattels and thereafter receives them in evidence against the applicant over his objection, it is an error for which a judgment of conviction must be reversed:" 10 Ruling Case Law, 933.

As to the second question, was the arrest a legal one?

It was made by a peace officer without a warrant of arrest.

At common law a peace officer had the right to arrest without a warrant for (1) A felony (a) committed or attempted in his presence or within his view; (b) to prevent the commission of a felony; (c) upon reasonable suspicion of or probable grounds to suspect one to be committing a felony. (2) A breach of the peace.

3 D. & C.

He had no power under the common law as an officer to make an arrest without a warrant for any offence less than a felony, with the single exception of a breach of the peace.

"The term 'breach of the peace' is generic and includes all violations of such peace or order or acts tending to the disturbance thereof:" 5 Cyc., 1024.

"Breaches of the peace generally manifest themselves by some outward, visible, audible or violent demonstration; not from quiet, orderly and peaceable acts secretly done, though such acts may be *mala prohibita:* 8 Ruling Case Law, 285.

Now the proper officer may also arrest one committing any other misdemeanor than a breach of the peace on view when the exigencies of the case require it, so that the offender may not escape.

The subject is fully discussed in 1 Wharton's Criminal Procedure (10th ed.), 69, etc., wherein, at page 73, it is laid down: "The better view, however, is that the right to apprehend for an offence committed in the officer's presence is limited to felonies, breaches of the peace and to such misdemeanors as cannot be stopped or redressed except by immediate apprehension." But the act with which the defendant stands charged does not come under any of these classes.

The respective officers may also arrest for other misdemeanors than breaches of the peace where the Act of Congress or a statute of the State or a municipal ordinance authorizes it to be done, but without such authority it cannot be done. At the time of the arrest of this defendant there was nothing in the statutes of Pennsylvania clothing the officers with such authority.

The depositions disclose that the defendant, charged with violating the liquor laws of the State, was quietly doing the same in his own home at half-past 10 o'clock at night, and the peace officers, without authority of the law, entered this home and made the arrest of the defendant. We are of the opinion that the conduct of the officers was an infringement upon the fundamental rights of personal security and private property of the defendant, lying at the very foundation of our government, as guaranteed by the Constitution of our State.

Our mode of criminal procedure is that an information should be made against the accused before a magistrate having competent jurisdiction, founded on knowledge or probable cause, and thereupon may follow the issuance of a warrant of arrest.

In the case of Com. v. Krubeck, 23 Pa. C. C. Reps. 37, 8 Dist. R. 521, the court said: "The ordinary mode of criminal procedure requires a warrant of arrest founded on probable cause, supported by oath or affirmation, to be first issued against the accused by some magistrate having competent jurisdiction. The accused, who may be an innocent person, thus secures at the outset the efficient guaranties against the oppression of power or prejudice afforded by the moral and legal responsibilities of a public oath, and the liability on the part of his prosecutor to respond in damages if the prosecution be malicious. The fitness and propriety of this procedure, and its equal justice to accuser and accused, make it unwise to depart from it, except under special circumstances or pressing emergencies: In the case of Lloyd & Carpenter, 3 Clark, 188. But the rights of the individual must yield where the safety and welfare of society are threatened, and, hence, it has long been recognized that arrests without warrant are justified in cases of treason, felony or breach of the peace, in which actual or threatened violence is an essential element: 1 Hale's P. C., 589; 2 Hawkins's P. C., ch. 13, § 8; 1 Burns, J., 287; 4 Blackstone,

Commonwealth *v.* Kekic.

292; 9 Bac. Abr., 468; 1 Chitty Cr. Law, 15; Clark's Criminal Procedure, 39; 3 Russell, Crimes, 83; 4 Am. & Eng. Ency. of Law, 902."

The answer to the second question is that the arrest was illegal.

Wherefore, in this case we are of the opinion that the arrest of the defendant was illegal, the search and seizure of his property were unlawfully made, and that the property of the defendant was unlawfully taken from the possession of the petitioner.

And now, April 30, 1923, the rule is made absolute.

From William Jenkins Wilcox, Harrisburg, Pa.