19924

The STATE, Respondent, v. Kenneth G. LAWRENCE et al.,
Appellants

(212 S. E. (2d) 52)

6

*Messrs. Thomas W. Broadwater, Kenneth Kitts,* and *Jack McGuinn,* of Columbia, and *Richard G. Dusenbury,* of Florence, *for Appellants,*

*Messrs. Daniel R. McLeod, Atty. Gen.,* and *Robert M. Ariail* and *Richard P. Wilson, Asst. Attys. Gen.,* of Columbia, *for Respondent,*

*Messrs. Thomas W. Broadwater, Kenneth Kitts,* and *Jack McGuinn,* of Columbia, and *Richard G. Dusenbury,* of Florence, *for Appellants,* in Reply.

December 10, 1974.

BRAILSFORD, Justice.

The appellants, Kenneth G. Lawrence, Elizabeth Reed and Edward Reed, at the December, 1973, term of the Court of General Sessions for Florence County, were convicted of conspiracy to violate Act No. 445 of 1971 relating to narcotic and other controlled drugs. They have appealed on sixteen exceptions which are argued in the brief under five divisions.

Lawrence is a medical doctor specializing in obstetrics and gynecology. The Reeds are husband and wife. During the times in question, Mrs. Reed was Dr. Lawrence's patient and part-time, unpaid assistant.

Arrest warrants were issued when an inspector of the Narcotics and Drug Control Division of the State Department of Health learned that in a number of instances Mrs. Reed had obtained relatively large quantities of amphetamine on prescriptions written by Dr. Lawrence, which purported to prescribe the drug for persons who, in fact, were strangers to the transactions, and that Mr. Reed had obtained amphetamine by like means on one occasion.

On September 19, 1973, a warrant was issued authorizing the search of Dr. Lawrence's office for records pertaining to five named persons to whom spurious prescriptions had ostensibly been furnished. On September 21, a warrant was issued authorizing an additional search for a list of persons for whom prescriptions for controlled drugs had been written but who were in fact not Dr. Lawrence's patients. Both warrants were served, limited searches of Dr. Lawrence's office were conducted, and a motley but relatively small collection of records and memoranda relevant to the charge were seized.

These records were allowed in evidence at the trial over the objection of Dr. Lawrence that their seizure and use violated his constitutional privileges against unreasonable

searches and seizures and against self-incrimination. The first issue argued in the brief is the claim that the admission into evidence of the products of these searches was error on these grounds.

These records consist largely of four pseudo patient charts reflecting prescriptions of drugs to the persons named, but which were actually obtained by Mrs. Reed, and various lists of names and addresses, sometimes including ages and weights, and a general description of pills desired (*e.g.,* black ones). These lists are apparently in Mrs. Reed's handwriting. On many of them, a specific designation of the drug and dosage prescribed has been added by Dr. Lawrence. Some of these writings are illegible to us, and we quote appellants' description of their nature and effect.

"The writings seized by the offending search warrant could scarcely have been more incriminating: (1) They showed repeated trafficking in pill transactions by the Defendants Lawrence and Reed. (2) They showed intermingled handwriting of the Defendants Reed and Lawrence. . . . (3) (T)he written memoranda contained repeated references to prosecuting witnesses, for whom prescriptions were written, but each of whom denied authorizing them or that he or she was a patient of Dr. Lawrence. . . . For example, the names Leonilda Harrell, Mrs. B. F. Anderson, Mrs. Bob Parker and Mr. and Mrs. James Dew. (4) The note from Reed to Lawrence constituting the exhibit on p. 38 of the transcript was devastating. It is fair to say that this evidence was the most incriminating evidence submitted by the State."

The note, referred to in the above quotation, again in Mrs. Reed's handwriting, conveyed the purported request of a Mr. Dew, "who couldn't go set with all the women" (in the doctor's office) that his prescription be put in his wife's name. This is followed by Mrs. Dew's name and address and the word "Black." At the bottom of the note in Dr. Lawrence's handwriting appear "8 June 1973 Biphet 20 100 t t.i.d. (one, three times daily)."

Citing *Hill v. Philpott,* 445 F. (2d) 144 (7th Cir. 1971), cert. denied, 404 U. S. 991, 92 S. Ct. 533, 30 L. Ed. (2d) 542 (1971), as being almost directly in point, appellants contend that the seizure and use at the trial of these records violated rights "guaranteed them under the interrelated operation of the Fourth and Fifth Amendments of the United States Constitution."

It is generally held that to compel a defendant, by subpoena or court order, to produce his private records or papers for use as evidence against him violates his privilege against self-incrimination. *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1885). In the case relied upon by appellants, the Court of Appeals for the Seventh Circuit, one judge dissenting, extended this rule to the records of a taxpayer which had been seized by agents of the Internal Revenue Service under valid search warrant procedures. *Hill v. Philpott, supra.*

A unanimous Court of Appeals for the Sixth Circuit in *United States v. Blank,* 459 F. (2d) 383 (6th Cir. 1972), cert. denied, 409 U. S. 887, 93 S. Ct. 111, 34 L. Ed. (2d) 143 (1972), pointing to an important distinction between records sought by subpoena and those procured by search warrant,[1] refused to follow *Hill v. Philpott,* and held that the use as evidence against an accused of his business records which had been taken from him under a valid search warrant is not compelled self-incrimination. We are persuaded to this view by the reasoning of the Court and by the authorities cited in its opinion. There being no challenge to the validity of the search warrants on this appeal, except the untenable claim that, as private records, the documents in question were exempt from seizure, we find no merit in the appellants' Fourth and Fifth Amendment claims.

---

[1] "The subpoena compels the person receiving it by his own response to identify the documents delivered as the ones described in the subpoena. The search warrant involves no such element of compulsion upon an actual or potential defendant." 459 F. (2d) at 385. For an elaboration of this rationale, see 8 Wigmore, Evidence, Sec. 2264 (McNaughton rev. 1961).

The next three questions (2, 3 & 4) are argued together and are all premised on the claim that the drug amphetamine, to which the evidence against appellants related, was not scheduled by the Act as a controlled substance at the times referred to in the indictment and evidence.

Act No. 445 of 1971, the Drug Act, divided covered drugs into Schedules 1 through V according to their potential for abuse and other criteria. The drug amphetamine was on Schedule III when the Act was adopted in June, 1971, indicating that it possessed less potential for abuse than those on Schedules I and II, but a greater potential than those drugs listed on Schedules IV and V. Soon afterward, the South Carolina Board of Health, to which limited authority was given to add, delete or reschedule drugs by rule when the General Assembly was not in session, undertook to follow the lead of federal authorities by transferring amphetamine from Schedule III to Schedule II. Notice of this change was filed in the office of the Secretary of State, and the Board recommended to the General Assembly that this transfer be adopted legislatively, which was finally done by Act No. 1068 of 1974.

The appellants were originally indicted in October, 1973, for offenses alleged to relate to a Schedule II drug. When appellants challenged the efficacy of the Board's attempt to place amphetamine on Schedule II, for failure to give required notice and opportunity for hearing to all interested parties and failure to make required findings, the appellants were reindicted for conspiracy to violate the Act with respect to amphetamine, "a controlled substance under Schedule II or Schedule III of the aforesaid Act . . . ."

The appellants then renewed their attack on the indictment and requested an opportunity to present evidence demonstrating the Board's failure to comply with statutory and due process requirements in the rule-making process. The court refused upon the ground that it was immaterial whether amphetamine was on Schedule II or Schedule III

at the times named in the indictment, since, in either event, it was a controlled substance.

We agree and find it unnecessary to counter in detail the long and involved argument of counsel. Appellants were indicted and convicted of conspiracy to violate Section 32-1510.51(a)(3), Code of 1962 (1973 Supplement) (fraudulently obtaining possession of a controlled substance) and (4) (putting false, material information into a document required by the Act). The offense concerns conspiracy to obtain possession of a controlled substance by fraud, without regard to the scheduled classification of the drug. It was unnecessary for the indictment to designate the schedule on which amphetamine was listed in order to fully apprise appellants of the charge against them; hence, appellants' claim that "due process would require that the State specifically designate the particular schedule being violated" is without merit.

The claim that amphetamine lost its status as a controlled substance by the allegedly ineffectual attempt of the Board to transfer it to Schedule II is likewise insubstantial. Amphetamine was included as a Schedule III controlled substance by the terms of the Act when adopted in 1971. Soon afterward, the Board undertook to reschedule the drug to Schedule II, and the Act was amended to this effect in 1974. If the Board's attempt to reschedule was not soundly based, which we need not decide, the result was simply to leave amphetamine as a Schedule III controlled substance until transferred to Schedule II by the legislature.

Under question 5, the appellants complain of the admission of "irrelevant and prejudicial evidence and testimony" in seven particulars, which they summarize as follows:

"(1) In allowing the State to introduce irrelevant, incompetent and prejudicial manufacturer's drug instruction inserts, in that such evidence violated Defendant's right under the Sixth Amendment of the United States Consti-

tution to confront and examine witnesses and to have the assistance of counsel; (2) in permitting the State to introduce the detailed Courthouse records of tax liens, judgments and financial insolvency in that such evidence had insignificant probative value and was highly prejudicial; (3) In failing to grant Defendant's motion for mistrial when the State was permitted to imply Defnedants were engaging in drug traffic, a highly opprobrious and prejudicial insinuation violative of Defendants' rights to due process and a fair and impartial trial; (4) in permitting the State to offer the testimony of a psychiatrist, Dr. E. W. Camp, in reply, on the advisability of prescribing the drugs in question as weight control measures and the inflammatory testimony of the effects of such drugs in that such opinion testimony was not relevant to the issues in the case, was not properly in reply, and prejudicial to an extreme degree; (5) in permitting the State to introduce the 'black market' value of such drugs in that there was no evidence such were intended for, or were in fact delivered to the 'black market'; (6) in permitting the State to offer the testimony of Dr. Shuler, a pharmacist only *and not a licensed doctor* on a purely medical question of the advisability of the medical prescriptions and an evaluation of the quantities thereof; (7) in permitting the State to offer testimony in reply of a medical doctor (Dr. Jeter) and of other medical doctors (Dr. Morris) in that such testimony was not relevant to the issues in the case and was not properly in reply and prejudicial to an extreme degree."

(1) *Manufacturer's inserts*

(4) *Dr. Camp, testimony in reply*

(7) *Dr. Jeter and Dr. Morris, testimony in reply*

During his direct testimony, Dr. Lawrence discoursed at some length on the nature and effect of amphetamine and its proper use in weight reduction programs such as he supervised. He testified, in effect, that he had prescribed the drug only in the exercise of his medi-

cal judgment as to the best interest of his patients, and that the large doses which he prescribed were medically sound. He was then cross-examined on so-called manufacturer's inserts, which are printed matter inserted into quantity packages describing the drug involved and furnishing recommendations as to use and dosage. These were in some respects strikingly different from what Dr. Lawrence had testified was sound medical practice. Dr. Lawrence testified that he was familiar with these inserts, and they were admitted into evidence over counsel's objection.

We think that the inserts were properly admitted. While a physician is not bound by a drug manufacturer's recommendations, they are certainly material factors for consideration in prescribing its product. Although the soundness of Dr. Lawrence's medical judgment was not at issue, his good faith was of the essence. The jury was entitled to consider these recommendations, and the testimony of other medical experts called by the State in reply, in weighing the credibility of Dr. Lawrence's testimony that he had written the challenged prescriptions in normal course of medical practice, rather than in furtherance of the alleged conspiracy.

In further reply to Dr. Lawrence's testimony that he had only prescribed the drug in good faith in the exercise of his discretion as a medical doctor, the State called three medical experts.

Dr. Camp, a psychiatrist, testified in the most positive terms that amphetamine is a very dangerous drug indicated for use only in treatment of narcolepsy, which is a form of epilepsy. When the witness was asked about the advisability of its use for weight control, counsel objected to "this as not being one of the issues in the case." The objection was overruled, and the witness responded that "there is no indication for them to ever be used in weight reduction." On cross-examination the witness stated again and again in the strongest of terms that, with the exception noted, the prescription of amphetamine was medically unwarranted.

Dr. Jeter testified that he had attended Mrs. Parker, in whose name two of the spurious prescriptions had been written, as her regular physician since 1965. He described certain chronic bodily and emotional conditions suffered by Mrs. Parker which, in his opinion, contraindicated the use of amphetamine, and testified, in effect, that the use of the drug by her would be disastrous. There was no objection to his testimony, and he was cross-examined at length on the opinions which he expressed.

Dr. Morris testified that he himself used amphetamine in weight reduction programs and that he personally knew of four or five other local doctors who did so. He also was aware that some doctors considered the drug too dangerous for such use, but he did not agree. However, he would not approve of a dosage of as many as three per day for weight control, which the challenged Lawrence prescriptions uniformly called for.

The exception to allowance of the testimony of Dr. Camp conforms to the objection made at the trial, *i.e.,* that it "was not relevant to the issues in the case and was prejudicial to an extreme degree." We are inclined to agree that the testimony of this witness should have been excluded as irrelevant. His condemnation of the use of amphetamine as an aid to weight reduction went far beyond the theory of the State's case, which did not challenge the propriety of the use of the drug in such programs. However, sandwiched, as it was, between the State's reliance upon the manufacturer's instructions and the other medical testimony offered by the State in reply, all of which clearly recognized the medical value of the discreet use of amphetamine for weight reduction, we see no possibility that this testimony prejudiced appellants' case.

The exception to the testimony of Dr. Jeter and of Dr. Morris is "that such testimony was not properly in reply to new matter and was irrelevant and highly prejudicial." No objection was made at the trial to the testimony of Dr. Jeter. Furthermore, his testimony was

clearly in reply to Dr. Lawrence's claim that the prescriptions had been written in the normal course of his practice, and was relevant to the issue of good faith in writing two prescriptions for Mrs. Parker. The testimony of Dr. Morris was also in reply to Dr. Lawrence's tsetimony concerning proper usage of the drug and was relevant to the issue of good faith.

(2) *Tax liens and judgments*

After Dr. Lawrence testified on direct examination ▪ that he had a very lucrative practice from which he received from $180,000.00 to $200,000.00 per annum, it was developed on cross-examination, over objection for irrelevance, that tax liens and judgments on file against him totaled over $250,000.00. We think that the testimony was relevant, at least to rebut any inference from the doctor's claimed affluence that he had no motive for seeking illegal gain.

(3) *Implication that appellants were engaging in drug traffic.*

(5) *Testimony as to black market value of drugs.*

The head of the Narcotics Division of the Florence ▪ County Sheriff's Department was asked whether he had had occasion to participate in illegal drug traffic investigations, as a preliminary to questioning him about the black market value of the drugs obtained by the Reeds on prescriptions furnished by Dr. Lawrence. These questions were objected to on the ground that the drugs in question were not illegal drugs and that the appellants were not charged with selling them. The court ruled the testimony as to the value of the drugs when sold without a prescription was relevant to the charge of conspiracy. We agree. The testimony tended to prove that the Reeds obtained some 1600 pills or capsules, each containing 20 milligrams of amphetamine, on spurious prescriptions written by Dr. Lawrence. That these drugs had a black market resale value tended to prove motive for the conspiracy.

(6) *Testimony of pharmacist.*

Dr. Shuler testified that in his experience the prescription of amphetamine to be taken three times per day was most unusual; that the usual dose was one per day taken at about 10:00 A.M. This was clearly within his competence as an experienced pharmacist. He did go further and explain the reason for giving the dose at 10:00 A.M., relating it to the drug's stimulating effect on the nervous system, resulting in "difficulty in going to sleep if taken later on." If this exceeded the witness' competence, which we do not decide, it did no harm to appellants' cause, because the fact stated was otherwise abundantly clear on the record.

Appellants purport to argue exceptions 8 and 10 under question 6, which we quote from the brief:

"Did the Trial Court as a matter of law deprive the accused(s) of a fair and impartial trial by substituting recklessness and/or wilfullness in place of specific intent?"

Exception 8 charges that the court erred in permitting testimony "as to recklessness by Dr. Lawrence in issuing certain prescriptions" in that such evidence was irrelevant and prejudicial. The argument of this exception is in general terms and fails to identify the testimony complained of. It broaches no issue not already disposed of under question 5, (1), (4) and (7).

Exception 10, which complains of error in the instructions, is nowhere argued in the brief; hence, it is deemed abandoned.

The remaining exception, No. 12, asserts that the court erred in refusing to instruct the jury that "admissions of culpability made after a conspiracy has ended are only admissible against the defendant conspirator making them in that the State failed to establish a proper foundation for the testimony of Mrs. B. F. Anderson as to admissions of Mrs. Reed made at an undetermined time, admissions incriminated both her and the defendant Lawrence."

The exception is not supported by the record, which shows that the conversation with Mrs. Reed to which Mrs. Anderson testified took place "on Tuesday following August 12th (1973). So that would have been on the 14th." It was on Sunday, August 12, that the pharmacist Shuler had filled four of the spurious prescriptions, two for Mrs. Reed and, later on the same day, two for Mr. Reed, for a total of 400 20 milligram amphetamine pills. There is nothing in the record to indicate that the conspiracy, which the jury found, terminated prior to the commencement of the investigation by the Narcotics and Drug Control Division on August 16, 1973. No request was made that the court submit to the jury an issue as to whether the statements made by Mrs. Reed were in furtherance of the conspiracy.

Affirmed.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.

